## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| VINCENT AMBROSIA JR. and ROBERT HOUPT, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiffs*, | |
| v. | |
| BLAZESOFT LTD., BLAZEGAMES, INC., SSPC LLC d/b/a SPORTZINO, and SCPS LLC d/b/a ZULA CASINO, | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Vincent Ambrosia Jr. and Robert Houpt bring this case, individually and on behalf of all others similarly situated, against Defendants Blazesoft Ltd. ("Blazesoft"), Blazegames, Inc. ("Blazegames"), SSPC d/b/a Sportzino ("Sportzino"), and SCPS d/b/a Zula Casino ("Zula") (collectively, "Defendants") to enjoin their operation of illegal online casino games and to seek restitution, damages, and other appropriate relief. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief, including investigation conducted by their attorneys, as to all other matters.

### NATURE OF THE ACTION

1.      This action arises from a predatory scheme orchestrated by Defendants through their illegal online casinos, Sportzino and Zula. Defendants lure consumers to their platforms by falsely marketing them as free-to-play "sweepstakes" casinos when, in reality, they operate as unregulated gambling traps where users wager and lose real money playing virtual slot machines and other casino-style games of chance over the Internet.

1

2.      At the heart of Defendants' "sweepstakes" casino model is a dual-currency system deliberately crafted to obscure the fact users are engaging in real-money gambling. Consumers purchase "Gold Coins," which can be used to play "free" casino games but are not redeemable for real money outside of the platforms. However, each purchase of Gold Coins is "bundled" with Sweepstakes Coins ("Sweeps Coins"), which can be wagered on games of chance (plainly branded as "casino-style slots," for instance) and actually redeemed for cash at a 1:1 ratio to the U.S. Dollar. For every dollar spent on Gold Coins, players receive a nearly equivalent number of Sweeps Coins, exposing Gold Coins as a thin veil over the truth that players are really purchasing Sweeps Coins for real-money, virtual gambling.

3.      Virtual gambling is highly addictive and strictly regulated in Illinois. By law, these games can only be offered by licensed operators in licensed, physical locations, where the Illinois Gaming Board ensures fair play and enforces consumer protection standards. Virtual gambling can never be offered to consumers over the Internet, as online gambling is expressly prohibited in Illinois. *See* 720 ILCS 5/28–1(a)(12) (criminalizing the operation of an "Internet site that permits a person to play a game of chance or skill for money or other thing of value").

4.      By enabling Illinois residents to purchase Sweeps Coins, wager them on games of chance over the Internet, and redeem them for real money, Defendants are effectively operating unlicensed and illegal online casinos. And without any oversight or accountability, Defendants flout Illinois gambling regulations by, for example, allowing individuals under the age of 21 to gamble on their platforms in violation of state law designed to protect minors, 230 ILCS 10/11(10); 230 ILCS 40/40; 230 ILCS 10/18(b)(1), and failing to provide gambling addiction resources for problem gamblers. 230 ILCS 10/13.1(a); 11 ILL. ADMIN. CODE 1800.1750.

2

5. Defendants' misconduct inflicts particularly severe harm on vulnerable populations, including individuals predisposed to gambling addiction and younger consumers targeted through "free play" marketing. Defendants aggressively market and promote their online casinos on social media platforms, using deceptive tactics to entice users into engaging with their seemingly harmless games. By masking real-money gambling as "sweepstakes" promotions, Defendants create a dangerously misleading environment that fosters unchecked gambling in Illinois—precisely the harm that the Illinois Legislature sought to prevent. This deliberate obfuscation exposes unsuspecting Illinois consumers to significant risks of financial ruin, psychological distress, and compulsive gambling addiction.

6. Accordingly, Plaintiffs, on behalf of themselves and other similarly situated individuals, bring this lawsuit to expose Defendants' predatory practices, recover funds lost by their victims, and dismantle their deceptive and unregulated gambling operations.

**PARTIES**

7. Plaintiff Vincent Ambrosia Jr. is a natural person and citizen of the State of Illinois.

8. Plaintiff Robert Houpt is a natural person and citizen of the State of Illinois.

9. Defendant Blazesoft Ltd. is a Canadian limited corporation with its principal place of business located at 222 Snidercroft Road, Unit 3, Vaughan, Ontario, L4K 2K1, Canada. Blazesoft owns and controls Blazegames, Sportzino, and Zula.

10. Defendant Blazegames, Inc. is a Delaware corporation with its principal place of business located in Ontario, Canada. Blazegames is the sole member of SSPC LLC and SCPS LLC. Blazegames is owned, controlled, and operated by Blazesoft from Ontario, Canada.

11.     Defendant SSPC LLC d/b/a Sportzino is a Delaware limited liability company with its business address listed as 1201 North Market Street, Suite 111, Wilmington, Delaware. The sole member of Sportzino is Blazegames. Sportzino and Blazegames are owned, controlled, and operated by Blazesoft from Ontario, Canada.

12.     Defendant SCPS LLC d/b/a Zula is a Delaware limited liability company with its business address listed as 1201 North Market Street, Suite 111, Wilmington, Delaware. The sole member of Zula is Blazegames. Zula and Blazegames are owned, controlled, and operated by Blazesoft from Ontario, Canada.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

14.     This Court has personal jurisdiction over Defendants because they conduct substantial, continuous, and systematic business in Illinois—including by entering into contracts with Illinois residents and engaging in ongoing economic relationships with them. Furthermore, Defendants purposefully directed their activities in the District by providing services to the residents of this District that they knew would be used within this District, advertising their services in Illinois, and actually profiting from the resulting illegal gambling taking place in the state on their platforms.

15.     Venue is proper in this District under the provision of 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial District, each Defendant is subject to personal jurisdiction in this District, and Defendants

transact business in this District. Further, venue is proper as to Blazesoft and Blazegames under 28 U.S.C. § 1391(c)(3) as they are foreign entities.

## STATEMENT OF FACTS

**I.    Blazesoft owns, operates, funds, and controls the Sportzino and Zula online casinos.**

16.    Blazesoft is a limited company based on Ontario, Canada that describes itself as "a pioneering force in the online entertainment industry, dedicated to redefining the boundaries of entertainment through cutting-edge technology and innovative gaming experiences."

17.    Blazesoft owns, operates, and controls the Sportzino and Zula online casino platforms. According to Blazesoft's Chief Executive Officer, Mickey Blayvas, "Zula Casino and Sportzino each reflect our ultimate ambition to be the number one player in the market."

### A.    Blazesoft launched Sportzino and Zula in 2023.

18.    Blazesoft launched Zula Casino on October 2, 2023. In a press release issued the same day, Blazesoft called Zula a new casino "with sweepstakes" that "features hundreds of casino-style slots, fish, and crash games supplied by the leading gaming providers across the globe," and "offers daily jackpots, tournaments, a loyalty program, and captivating promotions in an effort to always improve the player experience."[1]

19.    Blazesoft Senior Vice President of Strategic Initiatives, Yuliy German, explained that "Zula's launch marks a significant milestone in Blazesoft's journey to redefine the gaming experience. In keeping with our unwavering commitment to provide unparalleled entertainment, we're excited to offer players a truly engaging and enjoyable platform that uniquely blends social gaming with sweepstakes elements."

---

[1] *Blazesoft introduces its latest venture Zula Casino and reveals a $10M investment into its upcoming sports venture,* PR NEWSWIRE (Oct. 2, 2023, 07:57 ET), https://shorturl.at/Ab168.

20.    Blazesoft's October 2, 2023 press release also noted that:

Blazesoft's plans to scale don't stop with Zula Casino. *The company announced a $10 million investment into its future sports brand, Sportzino.com.* First of its kind, Sportzino will blend the worlds of social sports and casino-style gaming, offering a diverse range of sports and leagues, virtual sports, esports, hundreds of slots, bingo, and other game categories, daily tournaments, contests, and promotions. (Emphasis added).

21.    Six weeks later, Blazesoft announced the launch of Sportzino through a press

release issued on December 12, 2023:

Blazesoft, a leading provider of online gaming platforms, is excited to announce the launch of Sportzino.com, a groundbreaking brand that combines the thrill of social casino gaming with sports predictions. Sportzino has gone live a month ahead of its planned release, and is set to revolutionize the free-to-play gaming experience in the U.S. market.

*        *        *

Blazesoft, parent company of Sportzino.com, has experienced impressive growth and achieved market dominance over the past two years, particularly with the success of its flagship brand, Fortune Coins, which attracted over 4 million registered users in the US and Canada in under two years. Building on this achievement, the company introduced Zula Casino, another social casino with sweepstakes elements in September 2023. Learning from the experiences of Fortune Coins, Blazesoft team applied valuable insights to Zula, making it even more promising.[2]

22.    Blazesoft Senior Vice President of Strategic Initiatives, Yuliy German, stated:

We are excited to bring millions of new gaming enthusiasts into our one-of-a-kind product, brought to players by the same best-in-class team who delivered Fortune Coins Casino and Zula Casino. The launch of Sportzino.com marks a significant milestone for Blazesoft group and the gaming industry as a whole. With a constant focus on putting the player experience first, Sportzino.com is poised to hit the ground running and redefine the free-to-play sports predictions and social gaming sector in the U.S.

23.    Blazesoft understood that aggressive marketing and advertising campaigns were

---

[2] *Blazesoft Launches Sportzino.com to the U.S. Market, a Revolutionary Platform of Social Sportsbook and Casino,* CISION (Dec. 12, 2023, 10:12 ET), https://shorturl.at/xrB1d.

critical to the success of its casino platforms. When Sportzino launched, Blazesoft's Head of

Strategic Partnerships and Marketing, Yuliya Ivanisova, announced that:

> Sportzino.com has tremendous potential in the US market and beyond. With our
> starting estimated marketing budget of over $10 million for 2024, we are
> confident in our ability to establish Sportzino.com as a leading social gaming
> platform in North America. We are committed to continuous investment in this
> brand to meet the evolving needs of our players. We anticipate rapid growth and
> expansion in the next months, creating new opportunities for players and affiliate
> partners.

**B.     Sportzino (SSPC LLC) and Zula (SCPC LLC) are sham entities controlled
by Blazesoft from Ontario, Canada.**

24.     Both Sportzino and Zula were set up to appear as though they are legitimate

companies with business addresses located in Delaware, but as shown below, they are actually

sham companies that have no offices, employees, assets, or control over any aspect of the online

casinos they purport to operate.

25.     To that end, Sportzino and Zula both represent to consumers through their terms

of service, which are virtually identical, that their "business address" is located at 1201 North

Market Street, Suite 111, Wilmington, Delaware. But this "business address" is merely a virtual

office operated by a company called Opus Virtual Offices, LLC that Blazesoft chose to use as a

corporate mailing address. There are no Sportzino or Zula employees, business assets, or

business operations located at this address.

26.     Both Sportzino and Zula also disclose a second "registered address" on their

websites which are also identical. *Compare* Sportzino.com ("The registered address for SSPS

LLC. is 850 New Burton Road, Suite 201, Dover, DE 19904"), *with* Zulacasino.com ("The

registered address for SCPS LLC. is 850 New Burton Road, Suite 201, Dover, DE 19904"). But

this address also belongs to an unrelated third party, this time called Cogency Global Inc., that

provides remote "registered agent" services. There are no Sportzino or Zula employees, business

assets, or business operations located at this address either.

27.    Despite Blazesoft's superficial attempt to create the appearance that its illegal casinos are based in and operated from Delaware, Sportzino and Zula recently admitted through a court filing in *SCPS, LLC, et al. v. Kind Law, et al*., 24-cv-02768, Dkt. 1 (D.D.C. Sept. 27, 2024), that "[t]he Zula and Sportzino websites are administered and provided from, and all customer interactions are *handled exclusively from their affiliates' offices located in Ontario, Canada*," *id*. ¶ 3, and "Zula and Sportzino operate free-to-play social gaming websites that are *provided and administered from Ontario, Canada*," *id*. ¶ 13. (Emphasis added.)

28.    Sportzino's and Zula's terms of service, which are virtually identical (and cited collectively herein as "Terms" unless otherwise noted), provide further evidence that both companies are sham corporate shells operated, owned, funded, and controlled by Blazesoft. Specifically, the Terms state that:

(a)    "All Content is subject to and protected under the intellectual property rights and is *solely owned by Blazesoft Ltd*." Terms ¶ 1.1.2 (emphasis added). The term "Content" is defined to mean "all information, Games including sports prediction games, funpicks games, Documentation, images, text, data, links, documents, software, Sweeps Coins, Gold Coins, or other materials accessible and available to Users through our Website or Mobile Application." *Id.* (emphasis added);

(b)    the Sportzino and Zula websites, as well as all "Content and Service" provided is *"fully owned by Blazesoft Ltd*." Terms ¶ 1.1.22 (emphasis added); and

(c)    "All Content available on the Website and Mobile Application is the *sole and exclusive property of Blazesoft Ltd*. Any applicable third-party content is duly licensed to Blazesoft Ltd. Blazesoft Ltd. owns the sole title, sole ownership and legal interest in the trademarks, trade names, logos, patents, patent applications, web domains related to the Content, inventive steps and ideas, trade secrets, copyrights, whether registered or not, in all jurisdictions where the Content are available for the Users." Terms ¶ 14.1 (emphasis added).

29.    These provisions from Sportzino's and Zula's terms of service clearly state that

Blazesoft "solely" and "fully" owns everything on the Sportzino and Zula websites, including the websites themselves and all content, services, and intellectual property provided and displayed.

30.     The LinkedIn profiles for Blazesoft's executives and employees provide further evidence of their direct control, management, development, and operation of Sportzino and Zula.

31.     For instance, Blazesoft's Chief Executive Officer, Mickey Blayvas, prominently identifies Zula Casino and Sportzino in his biography next to his role as "CEO @ Blazesoft":



32.     Similarly, Blazesoft's Chief Commercial Officer, Yuliya Ivanisova, prominently identifies Zula Casino and Sportzino in her employment biography, and represents that she "lead[s]" Blazesoft's "efforts in building partnerships and marketing our brands—Fortune Coins, Zula, Sportzino, and Yay Casino. Our goal is to provide top-notch, free casino-style entertainment to players in the U.S. and Canada":



33.     Blazesoft's in-house counsel, Raghav Ghei, also prominently identifies Zula

Casino and Sportzino is his employment biography:



34.     Not even the "Head of Sportzino," Dmytro Uzundai, asserts that he is employed by Sportzino. Instead, his LinkedIn profile indicates that he is employed as a "Program Manager at Blazesoft":



35.     These LinkedIn profiles further demonstrate Blazesoft's ownership, control, and operation of the Sportzino and Zula casino platforms and underscore that the Sportzino and Zula entities are sham corporate shells with no employees or assets of their own.

## II.     Sportzino and Zula are online casinos that facilitate and profit enormously from real-money gambling.

36.     Lawful gambling has historically been limited to physical casinos or authorized venues where regulatory agencies and oversight bodies closely monitor gambling operations and enforce compliance with established standards. These controlled environments are designed to protect consumers by promoting fairness, ensuring transparency, and maintaining safeguards

against exploitation and misconduct.

37.     With advancements in technology, gambling has expanded beyond physical venues to online platforms, creating new opportunities and challenges for regulators. States that permit online gambling have adapted their legal frameworks to uphold the same standards of consumer protection and regulatory accountability established for traditional casinos.

38.     In states where online gambling is permitted, casino platforms are required to operate transparently, offering clear money-for-chance exchanges that are explicitly acknowledged as gambling and are subject to strict regulatory oversight to ensure compliance with state laws.

39.     Online gambling is not permitted in Illinois. The Illinois Legislature expressly prohibits businesses from operating an "Internet site that permits a person to play a game of chance or skill for money or other thing of value." 720 ILCS 5/28–1(a)(12). This prohibition reflects the state's public policy against online gambling, ensuring that consumers are not exposed to the risks of fraudulent or predatory practices commonly associated with such operations, especially where, as here, they are accessible 24 hours-a-day, 7 days-a-week through computers and mobile devices. *See* www.Sportzino.com ("Our platform is perfectly adapted to every iOS or Android-powered device out there. As such, you can make sports predictions and play games even on smartphones and tablets. The same sophisticated interface and simple layout is what you'll find when playing on mobile devices. So, even if you're used to the desktop site, you'll have no issues navigating the mobile platform."); *see also* www.zulacasino.com ("Our library is stacked with titles from industry-leading providers, and thanks to Zula Casino's intuitive platform, you can play these games on any device of your choice.").

40.     Defendants blatantly disregard Illinois' clear prohibition on online gambling. As

discussed further below, the Sportzino and Zula casino platforms allow users to purchase and wager "Sweeps Coins"—digital tokens that, like chips in a brick-and-mortar casino, can be redeemed at a 1:1 ratio to the U.S. Dollar—on games of chance, including slot machines, bingo, and other casino-style offerings. Effectively, Defendants operate unlicensed and illegal online casinos within Illinois.

**A.    Defendants' casino games are games of chance.**

41.    Defendants' Sportzino and Zula casino platforms host casino-style games that are unmistakably games of chance, including slot machines and bingo. The outcomes of these games are entirely determined by algorithms designed to simulate randomness, with no opportunity for skill or strategy to influence the results.

42.    Under Illinois law, a game of chance involves any activity where an outcome is determined predominantly by chance rather than skill. *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 25, 178 N.E.3d 1034, 1040 (Ill. 2020). Defendants' games fall squarely within this definition because players on Defendants' platforms wager Sweeps Coins on virtual slot machines where results are dictated entirely by random number generators ("RNGs"), replicating the mechanics of physical slot machines in brick-and-mortar casinos.

43.    Defendants emphasize the chance-based nature of their games to lure players with the promise of big payouts. On their websites, Defendants highlight the possibility of winning large sums, with messaging such as "spin to win" or "test your luck." These promotional tactics not only underscore the games' reliance on chance but also aim to foster the addictive hope of landing significant financial rewards.

44.    The games' reliance on chance is further demonstrated by the absence of any skill component. Slot machines, for example, require players to simply press a button to spin the reels

with outcomes wholly determined by RNGs. Other games, such as bingo and scratch cards, similarly involve no elements of skill, relying solely on luck to determine winners and losers.

45.     Defendants' game design deliberately replicates the hallmarks of licensed, chance-based casino games to create an authentic gambling experience. From spinning reels and celebratory animations to jackpot symbols and dynamic sound effects, all of the games provided on Defendants' platforms evoke the same psychological triggers that drive gambling behaviors in brick-and-mortar casinos.

46.     By offering these games of chance, Defendants are operating unregulated online casinos in violation of Illinois law, which explicitly prohibits gambling on games of chance conducted over the internet. 720 ILCS 5/28–1(a)(12). Their deliberate use of these chance-based games further underscores the unlawful nature of their platforms and the harm they perpetuate.

**B.     The Dual Currency System.**

47.     Defendants attempt to circumvent this prohibition of online gambling—and similar prohibitions in other states—by branding their casino games as free to play, so-called "sweepstakes" games. The core of Defendants' "sweepstakes" casino model is a dual currency system deliberately designed to obscure the fact users are engaging in real-money gambling. Players on Sportzino and Zula are introduced to two types of virtual currency: Gold Coins ("GCs"), which hold no monetary value and are marketed as being solely for entertainment purposes, and Sweeps Coins ("SCs"), which can be redeemed for real money at a 1:1 exchange rate to the U.S. Dollar and serve as the gateway to Defendants' illegal gambling operations.

48.     Gold Coins are presented as the primary currency for casual gameplay. Players can earn a limited number of Gold Coins through daily logins or promotions and thereafter must purchase more Gold Coins to keep playing. Defendants emphasize that Gold Coins are non-

13

redeemable in an effort to support their claim that their games are "free-to-play." However, alongside these purchases, Defendants bundle Sweeps Coins.

49.     Sweeps Coins are tokens that can be used to wager on the same casino-style games as Gold Coins, but they may be redeemed for cash at a 1:1 ratio with the U.S. Dollar.

50.     While Defendants insist that "NO PURCHASE OR PAYMENT IS NECESSARY TO OBTAIN Sweeps Coins," this is incredibly misleading. It is true that players can obtain a limited number of Sweeps Coins as bonuses for one-time "promotions," such as by initially signing up to use Defendants' services, completing an onerous mail-in request to obtain five Sweeps Coins, or linking the player's Facebook account. But the only way a player would even know about these "free" methods of obtaining Sweeps Coins is if they found Defendants' "Sweeps Rules" terms—which are not conspicuously linked anywhere in the casino games—and combed through the fine print. In fact, the only advertised way of obtaining Sweeps Coins is to purchase bundled packs of Gold Coins and Sweeps Coins. For example, when Sportzino players run out of Sweeps Coins, a message is displayed that directs them to "top up" their account (i.e., purchase more Sweeps Coins), as shown below in Figure 1:



**(Figure 1)**

51.     This message directing players to "top up" with Sweeps Coins is displayed even

14

when the players have an abundance of Gold Coins in their account.

52.     Even if a player could figure out how to get a limited allotment of free Sweeps Coins, the only way to immediately get more once that allotment is depleted is to purchase more.

53.     To purchase more Sweeps Coins, players purchase coin bundles that include both Gold Coins and Sweeps Coins. While Defendants characterize this transaction as one for Gold Coins with a "free bonus" of Sweeps Coins, the pricing structure and in-game prompts make clear that players are paying for the Sweeps Coins, not Gold Coins.

54.     For every dollar spent on Gold Coins, players receive a nearly equivalent value of Sweeps Coins, as depicted below in Figures 2 and 3. On the Sportzino Coin Store, for example, a bundle of 750,000 Gold Coins and 20.50 Sweeps Coins costs $19.99, and a bundle of 2,000,000 Gold Coins and 51.50 Sweeps Coins costs $49.99. This pricing structure clearly shows that Gold Coins serve only as superficial cover for the transaction of Sweeps Coins.



**(Figure 2, Zula Casino Coin Store)**



**(Figure 3, Sportzino Coin Store)**

55.     Consumers can make purchases from Zula Casino using Visa, Mastercard, and Skrill, and can make purchase from Sportzino using Visa, Mastercard, and Discover.

56.     In-game prompts also betray the fact that Defendants know that players are really purchasing Sweeps Coins when they make a Gold Coins purchase. For example, Defendants prompt players to purchase more Gold Coins (bundled with Sweeps Coins) once they have depleted their Sweeps Coins even if the players still have a cache of Gold Coins available to them.

57.     This dual-currency structure effectively converts what appears to be an innocuous gaming platform into an unregulated online casino where players use real money to gamble on games of chance. Courts throughout the country have found that when players spend money to obtain more "entries" or "bonus currency" despite already possessing unused amounts of the purported product (here, Gold Coins), there is unmistakable evidence that the "sweepstakes" or "promotion" is merely a front for gambling.

**C.      The Dual Currency System and Game Design Encourages Players to Wager Real Money.**

58.     Every aspect of Defendants' dual currency system is designed to encourage the transition from Gold Coins to Sweeps Coins. Indeed, Zula tells consumers that:

> After enjoying free gameplay with your Gold Coins, you can switch to Sweeps Coins and take your gaming experience to the next level. They work similarly to GCs; the only difference is that you can reclaim your SC winnings . . . You can also bulk up your SC coins by making a purchase at our store.

59.     Sportzino's efforts to transition consumers to Sweeps Coins is even more deceptive, telling consumers that, "Like Gold Coins, *you use SCs to play slots for free*. However, they are more valuable because you can exchange them for gifts. Just note that you can't

purchase Sweeps Coins. Instead, you receive them through promotions or bonuses when you buy Gold Coins." (Emphasis added.)

60.     To participate in Defendants' games, users choose whether to wager Gold Coins or Sweeps Coins, as shown in Figure 4, below:



Sportzino Game Play                    Zula Game Play

**(Figure 4)**

61.     At the top of both game screens displayed in Figure 4 are toggles, where players indicate—through a click of their mouse or tap on their phone or mobile device—whether they want to wager Gold Coins or Sweeps Coins. The selected currency is highlighted in full color, while the non-selected option appears faded. Figure 4 illustrates the screens as they appear when a player chooses to wager Sweeps Coins.

62.     This seamless toggle between currencies is present in every game. Defendants' toggle design lures players into wagering real money, often without fully understanding the shift from "free play" to real-money gambling.

63.     By creating an illusion of risk-free entertainment, Defendants' platforms manipulate users into participating in activities that carry severe financial and emotional consequences. Many players are misled into believing they are engaging in harmless gaming, only to find themselves spending significant sums of money chasing Sweeps Coin winnings. Defendants' platforms use celebratory animations, sound effects, and other psychological

17

triggers—hallmarks of traditional slot machines—to keep players engaged and spending. This manipulation disproportionately affects vulnerable populations, including individuals susceptible to gambling addiction, who may not recognize the financial stakes until they have already suffered significant losses.

64.     What's more, Defendants won't let players cash out until they win at least 50 Sweeps Coins after meeting certain "Playthrough Requirements." Sportzino's Sweeps Rules give the following example: "if a Participant receives 100 Sweeps Coins and those Sweeps Coins have a Playthrough Requirement multiplier of 2x, a Participant must play games totalling [*sic*] 200 Sweeps Coins prior to those Sweeps Coins being eligible for redemption as a Reward."

65.     These rules are intentionally opaque, so an example is helpful in illustrating how these "Playthrough Requirements" work: If a player pays $99.99 for 104 Sweeps Coins with a 2x Playthrough Requirement, the player must wager each of those Sweeps Coins twice before he can cash out. Now, let's say the player wagers the Sweeps Coins the first time and only wins 52 Sweeps Coins (losing half of the wagered Sweeps Coins). The player will be unable to cash out—even if he doesn't want to risk the remaining $52 worth of Sweeps Coins—until he wagers them again. The real kicker is that if, after wagering the coins a second time, the player only wins 26 Sweeps Coins, he will be entirely unable to cash out because Sportzino has a 50 Sweeps Coin cash out minimum. Accordingly, if the player wants to get any of his money back, he will have to buy and wager *more* Sweeps Coins to try to meet that minimum.

**D.     Defendants Offer Gambling Without Statutory Consumer Protections.**

66.     The harm inflicted through this dual currency system is further exacerbated by Defendants' lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections,

Defendants operate without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

67.     This is not just a theoretical danger—Defendants' online casinos actively undermine critical consumer protections required by Illinois law. For example, Defendants allow anybody over the age of 18 to gamble on its casino platforms in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in Illinois. *See, e.g.*, 230 ILCS 10/11(10) ("A person under age 21 shall not be permitted on an area of a riverboat or casino where gambling is being conducted . . . ."); 230 ILCS 40/40 ("No licensee shall cause or permit any person under the age of 21 years to use or play a video gaming terminal."); 230 ILCS 10/18(b)(1) ("A person is guilty of a Class B misdemeanor for . . . permitting a person under 21 years to make a wager."). Defendants also disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the Illinois Gaming Board Self-Exclusion Program. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 ILL. ADMIN. CODE 1800.1750.

68.     Instead of providing meaningful resources to address problem gambling, Defendants offer only a superficial and misleading commitment to "Responsible Social Gameplay," framing the issue as excessive video game use rather than gambling addiction. The support services listed on Defendants' website underscore the absurdity of this approach. For example, they direct consumers to "Gaming Addicts Anonymous," an organization designed to assist individuals struggling with video game addiction—not gambling addiction. Other

suggested resources include the Substance Abuse and Mental Health Services Administration, which addresses broad mental health and substance use issues, and the Financial Counseling Association of America, which focuses on credit counseling and debt management. None of these resources are specific to gambling addiction, further exposing Defendants' failure to address the actual harm caused by their platforms. This token effort to feign responsibility demonstrates Defendants' deliberate attempt to obscure the true nature of their operations and evade accountability for the significant harm they inflict.

**III.     Defendants deceptively market Sportzino and Zula as "sweepstakes" casinos to lure consumers and obscure the true nature of their illegal gambling operations.**

69.     Defendants market Sportzino and Zula as "sweepstakes" platforms to lure consumers into their online casinos under the guise of free play and harmless entertainment.

70.     Sportzino, for example, describes itself as a "Sweepstakes Sportsbooks and Casino" and a "Free to Play Social Sportsbook and Casino." It boasts a vast array of offerings, inviting consumers to "Play 1,000+ games: slots, scratch cards, crash games, table games, bingo, and much more!" The website's messaging is designed to entice players with promises like, "We are not just offering you access to unlimited fun; we're also giving you a chance to win big in the process," and "Our sweepstakes model offers you the chance to win free coins, which can be used on any game in our collection. Enjoy thrilling slots and sports events, and get the opportunity to redeem exciting rewards!"

71.     Similarly, Zula brands itself as an "online sweeps casino," "free sweeps casino," "social sweeps casino," and "online social casino." Its website invites U.S. players to "enjoy their favorite casino-style games for free" and touts the platform as "a new sweepstakes casino available to US players." Zula further promises of "Countless Bonuses and Promotions at Zula Sweepstakes Casino in the USA," suggesting an experience filled with free play and rewards.

72. These carefully crafted messages and branding strategies are intended to obscure the true nature of Sportzino and Zula as unlicensed online casinos where players wager real money through a deceptive system of "free" gameplay and misleading rewards. Both platforms present themselves as sweepstakes or social gaming experiences, while encouraging consumers to engage in what amounts to real-money gambling

**A. Defendants deceive consumers into believing their illegal casinos are legal.**

73. Defendants fraudulently represent to consumers through the Sportzino and Zula terms of service that their platforms **"DO NOT OFFER REAL MONEY GAMBLING."** (Emphasis in original.) This false representation leads consumers to believe that they are not actually engaging in real money gambling on Defendants' platforms, even when wagering with Sweeps Coins.

74. Defendants further fraudulently represent to consumers that their online casino platforms are "legal" and in compliance with state and federal law. Specifically, Sportzino's website promises consumers that "Sportzino complies with the laws of every jurisdiction that it operates in." Zula's website makes similar promises.

75. Both websites attempt to give consumers in Illinois (and elsewhere) additional comfort that they are not violating the law by identifying certain states where the platform is prohibited, thus creating the false and deceptive impression that Zula and Sportzino are being transparent about the legality of their platforms. Zula claims that it's casino "is legal and available in most US states. Currently, only players in Idaho, Washington, Georgia, and Michigan can't register and use our sweepstakes model. You must also be 18 years or older to create an account at Zula U.S. sweepstakes casino." Sportzino's Terms also purport to exclude players in these states from participation.

21

**B. Defendants aggressively advertise Sportzino and Zula on social media.**

76. Defendants leverage extensive and targeted social media campaigns to promote Sportzino and Zula, reaching millions of potential players across platforms such as Facebook, Instagram, TikTok, and X. Their advertisements are designed to captivate users with bold claims, exciting visuals, and the promise of big rewards, examples of which are shown in Group Figures 5 and 6, below:



**(Figure 5, Examples of Sportzino Ads on Social Media)**



**(Figure 6, Examples of Zula Casino Ads on Social Media)**

77. When a consumer clicks on any Sportzino or Zula advertisement on social media,

they are redirected to the platform's registration pages, which are shown in Figure 7, below:



**Zula Casino Registration Page**  **Sportzino Registration Page**
**(Figure 7)**

78.     These advertisements are carefully crafted to exploit the appeal of gambling while concealing the platforms' true nature as unregulated online casinos. By using flashy graphics, celebratory animations, and enticing language such as "Play for Free," "Highest Multiplier," and "Spin to Win," Defendants mislead consumers into believing they are engaging in harmless entertainment rather than real-money gambling.

79.     Defendants use social media platforms to target specific demographics, including younger audiences and vulnerable individuals, through personalized ads and promotional campaigns. As shown above, these ads often highlight the platforms' accessibility and offer bonuses for signing up. By leveraging data-driven advertising strategies, Defendants ensure their promotions reach individuals most likely to engage with their platforms, further amplifying the

23

harm caused by their deceptive practices.

80.     Through their aggressive and misleading social media campaigns, Defendants have succeeded in creating a broad user base, many of whom are unaware of the financial and emotional risks associated with their platforms. These advertising tactics underscore Defendants' calculated effort to maximize profits while evading the accountability and consumer protections required of licensed gambling operations.

### FACTS SPECIFIC TO PLAINTIFF VINCENT AMBROSIA JR.

81.     Plaintiff Ambrosia has been playing Zula and Sportzino games since approximately May 2024. Plaintiff Ambrosia viewed advertisements for Zula and Sportzino on Facebook, which contained links to Defendants' casino platforms.

82.     After using the limited number of Sweeps Coins obtained through Defendants' promotions, Plaintiff Ambrosia purchased Sweeps Coins through Defendants' online stores in order to continue playing. When Plaintiff Ambrosia ran out of Sweeps Coins, he would purchase more even though he still had many Gold Coins.

83.     Thereafter, Plaintiff Ambrosia continued playing various slot machines and other games of chance within Sportzino and Zula, where he would wager Sweeps Coins for the chance of winning real cash prizes. Since he started playing, Plaintiff Ambrosia has wagered and lost (and Defendants therefore won) thousands of dollars at Zula's and Sportzino's games of chance, including in just the last six months.

### FACTS SPECIFIC TO PLAINTIFF ROBERT HOUPT

84.     Plaintiff Houpt has been playing Zula games since approximately December 18, 2023, and has been playing Sportzino games since approximately April 2, 2024. Plaintiff Houpt viewed advertisements for Zula and Sportzino, which contained links to Defendants' casino

platforms.

85.     After using the limited number of Sweeps Coins obtained through Defendants'

promotions, Plaintiff Houpt purchased Sweeps Coins through Defendants' online stores in order

to continue playing. When Plaintiff Houpt ran out of Sweeps Coins, he would purchase more

even though he still had many Gold Coins.

86.     Thereafter, Plaintiff Houpt continued playing various slot machines and other

games of chance within Sportzino and Zula, where he would wager Sweeps Coins for the chance

of winning real cash prizes. Since he started playing, Plaintiff Houpt has wagered and lost (and

Defendants therefore won) over $350 at Zula's games of chance and over $250 at Sportzino's

games of chance. Just in the last six months, Plaintiff Houpt has wagered and lost (and

Defendants therefore won) approximately $150 at Zula's games of chance and approximately

$200 at Sportzino's games of chance.

## CLASS ACTION ALLEGATIONS

87.     **Class Definitions**: Plaintiffs bring this action pursuant to Federal Rule of

Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves, a Nationwide Class, and two

Illinois Subclasses (collectively, the "Classes") defined as follows:

> **Nationwide Class**: All persons in the United States who have lost money wagering on
> Defendants' online casino games.
>
> **Illinois Subclass**: All persons in Illinois who have lost money wagering on Defendants'
> online casino games.
>
> **Illinois Loss Recovery Subclass**: All persons in Illinois who have lost at least $50
> wagering on Defendants' online casino games.

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and

members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors,

predecessors, and any entity in which the Defendants or their parents have a controlling

25

interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

88.     **Numerosity**: The exact number of members of the Classes is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, tens of thousands of consumers fall into the definition of the Nationwide Class and thousands of consumers fall into the definition of the Illinois Subclass and Illinois Loss Recovery Subclass. Members of the Classes can be identified through Defendants' records, discovery, and other third-party sources.

89.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions include, but are not limited to, the following:

(a)     Whether Defendants are the proprietors for whose benefit the online casino games are played;

(b)     Whether Defendants' online casino games are illegal under Illinois gambling laws;

(c)     Whether Plaintiffs and each member of the Classes lost money by gambling on Defendants' online casino games;

(d)     Whether Plaintiffs are entitled to recover his gambling losses under the Illinois Loss Recovery Act, 720 ILCS 5/28-8;

(e)     Whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

(f)     Whether Defendants operate internet gaming sites in violation of the

Canada Criminal Code;

(g)    Whether Defendants advertise their internet gaming sites in violation of the Ontario Consumer Protection Act; and

(h)    Whether Defendants have been unjustly enriched as a result of its conduct.

90.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes in that Plaintiffs and the members of the Classes sustained damages arising out of Defendants' uniform wrongful conduct.

91.    **Adequate Representation:**  Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes, as Plaintiffs and each member of the Classes lost money playing Defendants' illegal casino games. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

92.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Classes, and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies and practices challenged herein apply to and affect members of the Classes uniformly, and Plaintiffs' challenge of these practices and policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases

of Defendants' liability to Plaintiffs and to the other members of the Classes are the same.

93.    **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable. The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a class action, it would be difficult for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

94.    Plaintiffs reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Illinois Loss Recovery Act**
**720 ILCS 5/28-8**
**(<u>On behalf of Plaintiffs and the Illinois Loss Recovery Subclass</u>)**

95.    Plaintiffs incorporates the foregoing allegations as if fully set forth herein.

96.    Plaintiffs bring this claim on behalf of themselves and the Illinois Loss Recovery Subclass under the Illinois Loss Recovery Act, 720 ILCS 5/28-8, which was enacted to effectuate the State of Illinois' public policy against gambling.

97.    720 ILCS 5/28-8(a) provides that:

> Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court.

98.     The Illinois Supreme Court has found that the "purpose of Section 28-8(a) is not simply to undo illegal gambling transactions but 'to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism.'" *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 14 (quoting *Vinson v. Casino Queen, Inc*., 123 F.3d 655, 657 (7th Cir. 1997)).

99.     Plaintiffs, Illinois Loss Recovery Subclass members, and Defendants are "persons" within the meaning of 720 ILCS 5/28-8(a). *See* 720 ILCS 5/2-15 ("Person" means "an individual, natural person, public or private corporation, government, partnership, unincorporated association, or other entity.").

100.     The activity of "gambling" includes anyone who, *inter alia*, "knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28–1(a)(12), "knowingly plays a game of chance or skill for money or other thing of value," 720 ILCS 5/28–1(a)(1), or "knowingly . . . uses . . . any gambling device." 720 ILCS 5/28–1(a)(3).

101.     The Illinois Loss Recovery Act defines a "gambling device" as a "slot machine or other machines or device for the reception of money or other thing of value" that on "chance or skill . . . is staked, hazarded, bet, won, or lost." 720 ILCS 5/28–2(a).

102.     Defendants' Sweep Coins are money or things of value because they are directly tied to the U.S. Dollar at a 1:1 ratio and can be redeemed for real money through Defendants' online platforms, much like casino chips can be exchanged for cash in a brick-and-mortar casino.

103.     Defendants' online casino platforms—Sportzino and Zula Casino—are Internet

29

sites that permit consumers to play games of chance (e.g., online slot machines) for money or other things of value (Sweeps Coins).

104.    Every casino game offered on Defendants' online platforms is also a "gambling device" because they accept money or other valuable items (Sweeps Coins) from players, operate on chance using random number generators, and enable players to stake, hazard, and bet money or other valuable items (Sweeps Coins) with the potential to win or lose money or other valuable items (Sweeps Coins, which themselves are redeemable for money).

105.    Defendants' casino games do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendants are "winners" under the statute because they have a direct stake in the result of the gambling. When players wager Sweeps Coins and win, they can cash out the Sweeps Coins they win for real money at a 1:1 ratio—i.e. Defendants lose the dollar amount of the Sweeps Coins that the player won. In contrast, when players wager Sweeps Coins and lose, Defendants win the value of the Sweeps Coins that the players lose.

106.    By wagering and losing Sweeps Coins on Defendants' casino platforms, Plaintiffs and each member of the Illinois Loss Recovery Subclass gambled and lost money or things of value.

107.    Plaintiffs and the members of the Illinois Loss Recovery Subclass have lost more than fifty dollars gambling on Defendants' platforms.

108.    Defendants own, operate, and control the gambling games described herein, and directly profited from Plaintiffs' and the Illinois Loss Recovery Subclass members' gambling losses. Defendants are therefore the "winners" under 720 ILCS 5/28-8(a) of all moneys lost by Plaintiffs and the Illinois Loss Recovery Subclass members.

109. Plaintiffs' and the Illinois Loss Recovery Subclass members' losses occurred in Illinois because Defendants' online casino games were played by Illinois residents on computers, mobile phones, and mobile devices in the State of Illinois. Defendants had actual knowledge that Plaintiffs and the Illinois Loss Recovery Subclass members reside in Illinois because each of them selected "Illinois" as their state of residence and provided their complete home address pursuant to Defendants' mandatory registration process.

110. Plaintiffs, on behalf of themselves and the Illinois Loss Recovery Subclass members, seek an order requiring Defendants to (1) cease the operation of its gambling devices, and (2) return all lost monies, with costs, pursuant to 720 ILCS 5/28-8(a).

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS §§ 505/1, *et seq.***
**(On behalf of Plaintiffs and the Illinois Subclass)**

111. Plaintiffs incorporates the foregoing allegations as if fully set forth herein.

112. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq*., protects consumers and competitors by promoting fair competition in commercial markets for goods and services.

113. The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

114. The ICFA applies to Defendants' actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

115. Each Defendant is a "person" as defined by 815 ILCS 505/1(c).

116. Plaintiffs and the Illinois Subclass members are "consumers" as defined by 815

ILCS 505/1(e).

117.     Sweeps Coins are "merchandise" within the meaning of 815 ILCS 505/1(b) and Defendants' sale of Sweeps Coins constitutes "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

118.     Defendants' practices described above, including their operation of illegal casino platforms and sale of Sweeps Coins, were unfair within the meaning of the ICFA because they offended Illinois' public policy against unlawful and unregulated gambling, *see, e.g.,* 720 ILCS 5/28-7 (Gambling contracts void); *Hall v. Montaleone*, 348 N.E.2d 196, 198 (Ill. App. Ct. 1976) (stating that "gambling contracts or contracts for an immoral or criminal purpose" are "absolutely void and unenforceable" by reason of "public policy"), and were otherwise unethical, oppressive, and unscrupulous and caused substantial injury to the consumers who purchased Sweeps Coins on the Sportzino and Zula Casino platforms.

119.     Defendants caused substantial injury to Plaintiffs and the Illinois Subclass by inducing them to purchase Sweeps Coins through the design of their Sportzino and Zula Casino illegal gambling platforms. The injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

120.     Defendants' unfair practices occurred during the marketing and sale of Sweeps Coins for use on the Sportzino and Zula Casino illegal gambling platforms, and thus, occurred in the course of trade and commerce.

121.     Defendants represent to consumers, including Plaintiffs and the Illinois Subclass, that their platforms "**DO NOT OFFER REAL MONEY GAMBLING**" (emphasis in original) and mislead consumers into believing that they are not engaging in gambling by wagering

Sweeps Coins on the casino games offered on the Sportzino and Zula Casino platforms.

122.    Further, Defendants conceal from consumers, including Plaintiffs and the Illinois Subclass, that wagering with Sweeps Coins on their Sportzino and Zula Casino platforms constitutes illegal gambling prohibited by state law.

123.    To make matters worse, Defendants' casinos fail to provide the statutorily required consumer protections that every licensed casino in the State of Illinois must provide. For example, Defendants allow anybody over the age of 18 to gamble on its casino platforms in complete disregard to the laws prohibiting individuals under the age of 21 to gamble in Illinois. *See, e.g.*, 230 ILCS 10/11(10) ("A person under age 21 shall not be permitted on an area of a riverboat or casino where gambling is being conducted . . . ."); 230 ILCS 40/40 ("No licensee shall cause or permit any person under the age of 21 years to use or play a video gaming terminal."); 230 ILCS 10/18(b)(1) ("A person is guilty of a Class B misdemeanor for . . . permitting a person under 21 years to make a wager . . . ."). Defendants also disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the Illinois Gaming Board Self-Exclusion Program. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 ILL. ADMIN. CODE 1800.1750.

124.    Defendants aggressively market and advertise their Sportzino and Zula platforms on social media while at the same time concealing that they are illegal under state law. As such, Illinois consumers, including Plaintiffs and the Illinois Subclass, are highly likely to continue to encounter current and future iterations of Defendants' illegal platforms absent injunctive relief.

125.    Not only is Defendants' conduct unfair, but as discussed above, Defendants' conduct is also unlawful given that they knowingly maintain and operate "an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28–1(a)(12), and otherwise knowingly play games of chance for money or other things of value, 720 ILCS 5/28–1(a)(1), and knowingly use gambling devices, 720 ILCS 5/28–1(a)(3).

126.    Further, Defendants' conduct is immoral because it is designed to encourage illegal gambling while marketing the Casino as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

127.    As a direct and proximate result of Defendants' violations of the ICFA, Plaintiffs and the Illinois Subclass members have suffered harm in the form of monies paid and lost for Defendants' Sweeps Coins.

128.    Plaintiffs, on behalf of themselves and the Illinois Subclass members, seek an order requiring Defendants to (1) cease the unfair practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiffs and the Illinois Subclass, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Illinois Subclass)

129.    Plaintiffs incorporates the foregoing allegations as if fully set forth herein.

130.    Plaintiffs and the Illinois Subclass members have conferred a benefit upon Defendants in the form of the money they paid for the purchase of Sweeps Coins to wager on

Defendants' illegal casino platforms.

131.     Defendants appreciate and have knowledge of the benefits conferred upon them
by Plaintiffs and the Illinois Subclass.

132.     Under principles of equity and good conscience, Defendants should not be
permitted to retain the money obtained from Plaintiffs and the Illinois Subclass members, which
Defendants have unjustly obtained as a result of their unlawful operation of casino games. As it
stands, Defendants have retained millions of dollars in profits generated from its unlawful games
of chance and should not be permitted to retain those ill-gotten profits.

133.     Accordingly, Plaintiffs and the Illinois Subclass members seek full disgorgement
of all money Defendants have retained as a result of the wrongful conduct alleged herein.

**FOURTH CAUSE OF ACTION**
**Violation of the Ontario Consumer Protection Act, 2002**
**Section 13.1 (Advertising Illegal Internet Gaming Site)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

134.     Plaintiffs incorporates the foregoing allegations as if fully set forth herein.

135.     The Ontario Consumer Protection Act, 2002, S.O. 2002, c. 30, Sched. A
("OCPA"), protects consumers from unfair and deceptive business practices and ensures that
businesses operate in a manner that prioritizes transparency, fairness, and consumer rights.

136.     Plaintiffs and the Nationwide Class are "consumers" as defined by the OCPA § 1.
Specifically, Plaintiffs and the Nationwide Class members are individuals "acting for personal,
family or household purposes" and not for any business purpose.

137.     The OCPA also prohibits businesses from advertising illegal internet gaming
sites. *See* OCPA § 13.1(1) ("No person shall advertise an internet gaming site that is operated
contrary to the Criminal Code (Canada)."). "Internet gaming sites" are defined as "internet sites
that accept or offer to accept wagers or bets over the internet as part of the playing of or

35

participation in any game of chance or mixed chance and skill that is to take place inside or outside of Canada." OCPA § 1.

138.    The Sportzino and Zula Casino platforms are "internet gaming sites" because, as described throughout this complaint, they accept wagers or bets from consumers over the internet and facilitate their participation in games of chance.

139.    Under the OCPA, "a person advertises an internet gaming site only if the advertising originates in Ontario or is primarily intended for Ontario residents." OCPA § 13.1(3).

140.    The OCPA broadly defines the term "advertise" to include "providing, by print, publication, broadcast, telecommunication or distribution by any means, information for the purpose of promoting the use of an internet gaming site" and "providing a link in a website for the purpose of promoting the use of an internet gaming site." OCPA § 13.1(4).

141.    Defendant Blazesoft operates, administers, and controls the Sportzino and Zula Casino platforms—including all marketing and advertising—from Ontario, Canada. In fact, Blazesoft requires all employees to be physically present in its office in Ontario and does not allow remote work. According to Blazesoft's website, "Blazesoft exclusively hires for in-office positions. We do not offer remote job opportunities. Please do not respond to job postings or communications that claim to be related to remote positions at Blazesoft." As such, there can be no dispute that the advertising at issue originated from Ontario.

142.    Blazesoft's various press releases further demonstrates that it directs and controls the marketing for the Sportzino and Zula platforms. For example, in its press release dated December 12, 2023, Blazesoft's Head of Strategic Partnerships and Marketing, Yuliya Ivanisova, announced that:

> Sportzino.com has tremendous potential in the US market and beyond. With our starting estimated marketing budget of over $10 million for 2024, we are

confident in our ability to establish Sportzino.com as a leading social gaming platform in North America. We are committed to continuous investment in this brand to meet the evolving needs of our players. We anticipate rapid growth and expansion in the next months, creating new opportunities for players and affiliate partners.

These statements show that the advertising for Defendants' Sportzino and Zula Casino platforms not only originated in Ontario, but was directed, controlled, and funded from Ontario as well.

143.    Part VII of the Criminal Code (Canada) ("Criminal Code") broadly prohibits all forms of for-profit gambling, as well as the marketing of unlawful gaming and the transmitting of information related to unlawful gaming. *See* Crim. Code § 206.

144.    The Criminal Code, however, exempts from criminalization "lottery schemes" that are conducted and managed by provincial governments. *See* Crim. Code § 207(1)(a) ("Notwithstanding any of the provisions of this Part relating to gaming and betting, it is lawful for the government of a province . . . to conduct and manage a lottery scheme in that province . . . in accordance with any law enacted by the legislature of that province"). "Lottery scheme" is defined to mean "a game or any proposal, scheme, plan, means, device, contrivance or operation described in any of paragraphs 206(1)(a) to (g), whether or not it involves betting, pool selling or a pool system of betting." Crim. Code § 207(4).

145.    As such, the only lottery schemes (i.e., gambling operations) that are permitted by the Criminal Code are those that are "conducted and managed" by a Province (here, Ontario).

146.    As explained by the Supreme Court of Canada in *Reference re Earth Future Lottery (P.E.I.)*, 2002 PESCAD 8, 211 Nfld. & P.E.I.R. 311 (App. Div.), *aff'd* 2003 SCC 10, [2003] 1 S.C.R. 123, the Parliamentary purpose behind Criminal Code § 207 was to permit a *very narrow* exemption to the broad prohibition on gambling expressed in Criminal Code § 206:

The [Criminal Code] provisions . . . clearly demonstrate that Parliament does not happily abide gaming activities of any sort in Canada. The little it tolerates, it does

so grudgingly. Section 206 is prohibitive in nature, not regulatory. The purpose of Parliament in enacting it was generally outlaw gaming and lotteries, not just to ensure they would be run honestly.

*    *    *

Parliament's purpose in enacting [Section] 207 was to create a narrow exception to [Section] 206 legalizing certain provincially run or licensed lottery schemes.

147.   The government of Ontario established a regime for internet gambling in 2021 by creating iGaming Ontario ("iGO"), a subsidiary of the Alcohol and Gaming Commission of Ontario ("AGCO"), for the express purpose of conducting and managing prescribed online lottery schemes in accordance with the Criminal Code.

148.   The Ontario Gaming Control Act ("Gaming Control Act") establishes the regulatory regime for lottery schemes in Ontario, and importantly, requires all suppliers of goods or services for lottery schemes to be registered with the iGO. The Gaming Control Act further requires iGO to ensure that lottery schemes, gaming sites for lottery schemes, and businesses related to gaming sites or lottery schemes are conducted, managed, and operated in accordance with the rules of play, standards, and requirements established by the ACGO.

149.   Defendants' Sportzino and Zula Casino platforms are not registered with iGO, and thus Defendants are operating "internet gaming sites" in violation of the Criminal Code.

150.   Defendants' failure to register with iGO, as required by law, means that Defendants' Sportzino and Zula Casino platforms are operating without oversight and other protections designed to keep consumers safe. Registering with iGO is just the first step. Before conducting business through an internet gaming site in Ontario, operators like Defendants must enter into statutorily required contractual agreements with iGO that give iGO significant control over their internet gaming operations, including sole control over which games and which types of games are offered, "exclusive and unfettered" rights to control gaming data, the right to

approve and restrict advertising in its sole and absolute discretion, and oversight of customer care and dispute resolution. The statutorily required agreements also require operators to implement centralized self-exclusion programs and dedicate a specified percentage of its gross gaming revenue to problem gambling prevention education messages and campaigns. Registered operators are also bound by iGO's policies, which provide that iGO is the entity that engages in dispute resolution between players and operators, and that operators' games must properly use iGO's branding. These measures are put in place by the Ontario Legislature to ensure that consumers are adequately protected when engaging with the operators' internet gaming sites.

151.    The Sportzino and Zula Casino platforms are operated contrary to the Criminal Code because they are not licensed by iGO, and thus are not "conducted or managed" by the Provence of Ontario.

152.    Defendants aggressively advertise and promote their Sportzino and Zula Casino platforms on social media and other places on the internet. *See, e.g.,* Figs. 4, 5. Plaintiffs and every member of the Nationwide Class viewed one or more of Defendants' advertisements that contained links to Defendants' casino platforms. *See, e.g.*, Fig. 6.

153.    By failing to register with iGO and failing to comply with iGO's mandatory contractual provisions and policies, Defendants operated their internet gaming sites in violation of the Criminal Code, and thus in violation of OCPA § 13.1(1).

154.    Plaintiffs and the Nationwide Class members are entitled to rescission under OCPA § 18(1) because they entered into their contracts with the Defendants for Sweeps Coins after or while the Defendants engaged in the unfair and deceptive practice described above.

155.    Under the OCPA, "each person who engaged in an unfair practice is liable jointly and severally with the person who entered into the agreement with the consumer for any amount

to which the consumer is entitled under this section." OCPA § 18(12).

156.     As a direct result of Defendants' unlawful conduct, Plaintiffs and the Nationwide Class members have suffered financial harm, including losses incurred through the purchase and use of Sweeps Coins on Defendants' platforms.

157.     Accordingly, the Plaintiffs and the Nationwide Class members are entitled to recover damages equivalent to the value of all monies paid by the Plaintiffs and the Nationwide Class to Defendants resulting from the purchase of Sweeps Coins, pursuant to OCPA § 18(1).

158.     Plaintiffs and the Nationwide Class therefore seek an order requiring Defendants to (1) cease the unfair practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiffs and the Nationwide Class, and (3) pay damages, interest, and reasonable attorneys' fees, together with costs.

159.     The notice requirement should be waived pursuant to OCPA §18(5) in order to facilitate access to justice for Plaintiffs and the Nationwide Class members.

## FIFTH CAUSE OF ACTION
### Violation of the Ontario Consumer Protection Act, 2002
### Section 14 (Unfair Practices)
### (On Behalf of Plaintiffs and the Nationwide Class Against Defendants)

160.     Plaintiffs incorporates the foregoing allegations as if fully set forth herein.

161.     The OCPA prohibits businesses involved in the sale of goods and services from engaging in "unfair practices," OCPA § 17(1), and provides that "[i]t is an unfair practice for a person to make a false, misleading or deceptive representation." OCPA § 14(1).

162.     As described herein, Defendants violated the OCPA by: (a) advertising internet gaming sites that are operated in contravention to the Criminal Code; (b) misleading consumers through their branding of Sportzino and Zula as "sweepstakes casinos" to create the false impression that their platforms are harmless, risk-free entertainment instead of illegal, real-

40

money gambling operations; (c) using a dual-currency system to obscure the true nature of their illegal real-money gambling operations; (d) failing to disclose material facts about their gambling platforms, including that wagering with Sweeps Coins constitutes real-money gambling; (e) falsely stating that their platforms "**DO NOT OFFER REAL MONEY GAMBLING**" (emphasis in original); (f) concealing from consumers that their platforms are illegal under both the Criminal Code and Ontario law; and (g) failing to provide required consumer protection measures, such as problem gambling resources, oversight, and adherence to fair play standards.

163.    As a direct result of Defendants' unlawful conduct, Plaintiffs and the Nationwide Class members have suffered financial harm, including losses incurred through the purchase and use of Sweeps Coins on Defendants' platforms.

164.    Plaintiffs and the Nationwide Class members are entitled to rescission under OCPA § 18(1) because they entered into their contracts with the Defendants for Sweeps Coins after or while the Defendants engaged in the unfair and deceptive practice described above.

165.    Under the OCPA, "[e]ach person who engaged in an unfair practice is liable jointly and severally with the person who entered into the agreement with the consumer for any amount to which the consumer is entitled under this section." OCPA § 18(12).

166.    Plaintiffs and the Nationwide Class members are entitled to recover damages equivalent to the value of all monies paid by the Plaintiffs and the Nationwide Class members to Defendants resulting from the purchase of Sweeps Coins, pursuant to OCPA § 18(1).

167.    Accordingly, Plaintiffs and the Nationwide Class seek an order requiring Defendants to (1) cease the unfair practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiffs and the Nationwide

Class, and (3) pay damages, interest, and reasonable attorneys' fees, together with costs.

168. The notice requirement should be waived pursuant to OCPA §18(5) in order to facilitate access to justice for Plaintiffs and the Nationwide Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Vincent Ambrosia Jr. and Robert Houpt, individually and on behalf of the Classes, respectfully request that this Court enter an Order:

(a) Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as the representatives of the Classes, and appointing their counsel as Class Counsel;

(b) Declaring that Defendants' conduct, as set out above, is unlawful under 720 ILCS 5/28-8 and 815 ILCS 505/1, *et seq*.;

(c) Entering judgment against Defendants in the amount of the losses suffered by Plaintiffs and each member of the Classes;

(d) Enjoining Defendants from continuing the challenged conduct;

(e) Awarding damages to Plaintiffs and the members of the Classes in an amount to be determined at trial, including trebling as appropriate;

(f) Awarding restitution to Plaintiffs and the members of the Classes in an amount to be determined at trial;

(g) Requiring disgorgement of all of Defendants' ill-gotten gains;

(h) Awarding reasonable attorney's fees and expenses;

(i) Awarding pre- and post-judgment interest, to the extent allowable;

(j) Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Classes; and

(k)     Awarding such other and further relief as equity and justice require, including all forms of relief provided for under Plaintiffs' claims.

## JURY DEMAND

Plaintiffs requests a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**VINCENT AMBROSIA JR. and ROBERT HOUPT,** individually and on behalf of all others similarly situated,

Dated: February 19, 2025

By: */s/ Hannah Hilligoss*
One of Plaintiffs' Attorneys

J. Eli Wade-Scott
ewadescott@edelson.com
Michael Ovca
movca@edelson.com
Hannah Hilligoss
hhilligoss@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs*