**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**(Eastern Division)**

| | |
|---|---|
| VINCENT AMBROSIA JR. and ROBERT HOUPT, individually and on behalf of all others similarly situated, | Case No.: 1:25-cv-01723 |
| *Plaintiffs*, | |
| v. | |
| BLAZESOFT LTD., BLAZEGAMES, INC., SSPS LLC d/b/a SPORTZINO, SCPS LLC d/b/a ZULA CASINO, SOCIAL GAMING LLC d/b/a FORTUNE COINS, | |
| *Defendants*. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
**TO COMPEL ARBITRATION AND TO STAY**
**THIS ACTION PENDING RESOLUTION OF ARBITRATION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

ARGUMENT ............................................................................................................................ 4

   I.    THIS COURT SHOULD RESOLVE PERSONAL JURISDICTION BEFORE RULING
ON DEFENDANTS' MOTION. ......................................................................................... 4

   II.   ONTARIO LAW—INCLUDING THE ONTARIO ARBITRATION ACT—GOVERNS
DEFENDANTS' ARBITRATION MOTION. .......................................................................... 8

   III.   THE ARBITRATION CLAUSE IS UNENFORCEABLE UNDER THE ONTARIO
ARBITRATION ACT. ........................................................................................................ 11

      A.   The Arbitration Clause Is Barred by the Ontario CPA. .................................................. 11

      B.   The Arbitration Clause Is Unconscionable. .................................................................. 13

         1.   The Parties had unequal bargaining power. .............................................................. 14

         2.   The resulting bargain was improvident. .................................................................. 16

            a.   The bar on "Collective Arbitration" renders relief realistically unattainable. ...... 16

            b.   The bar on class arbitration renders relief realistically unattainable. .................. 19

         3.   This Court—not an arbitrator—decides unconscionability. .................................... 20

      C.   The Arbitration Agreement Is Part of an Unlawful Gambling Contract. ..................... 21

CONCLUSION........................................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am.'s MoneyLine, Inc. v. Coleman*,
　360 F.3d 782 (7th Cir. 2004) ........................................................................ 7

*Blockowicz v. Williams*,
　630 F.3d 563 (7th Cir. 2010) ........................................................................ 8

*Buckeye Check Cashing, Inc. v. Cardegna*,
　546 U.S. 440 (2006)..................................................................................... 22

*CC/Devas (Mauritius) Ltd. v. Antrix Corp.*,
　145 S. Ct. 1572 (2025).................................................................................. 6

*Davis v. Fenton*,
　857 F.3d 961 (7th Cir. 2017) ........................................................................ 5

*Derse Inc. v. Haas Outdoors Inc.*,
　No. 09-CV-97, 2011 WL 554060 (E.D. Wis. Feb. 4, 2011)............................ 8

*Fair Gaming Advocates MA LLC v. VGW Holdings Ltd.*,
　No. 2384-CV-02451, 2024 WL 5279408 (Mass. Super. Ct. Dec. 12, 2024).................. 22

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
　284 F.3d 1114 (9th Cir. 2002) ...................................................................... 6

*Gunn v. Cont'l Cas. Co.*,
　968 F.3d 802 (7th Cir. 2020) ...................................................................... 10

*Heckman v. Live Nation Entm't, Inc.*,
　120 F.4th 670 (9th Cir. 2024) ................................................................ 20, 21

*Hines v. Stamos*,
　111 F.4th 551 (5th Cir. 2024) ...................................................................... 4

*Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*,
　293 F.3d 392 (7th Cir. 2002) ........................................................................ 6

*Kater v. Churchill Downs Inc.*,
　423 F. Supp. 3d 1055 (W.D. Wash. 2019)................................................... 15

*Kennedy v. VGW Holdings Limited, et al.*,
　1:24-CV-2184-TWT, 2025 WL 1932750 (N.D. Ga. Jul. 14, 2025) ................ 16

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941) .................................................................................................. 9

*MacClelland v. Cellco Partnership*,
    609 F. Supp. 3d 1024 (N.D. Cal. 2022) ................................................... 17, 18

*McHenry Cnty. v. Raoul*,
    44 F.4th 581 (7th Cir. 2022) ................................................................................ 10

*Midwest Grain Prods. of Ill., Inc. v. Productization, Inc.*,
    228 F.3d 784 (7th Cir. 2000) ............................................................................... 9

*Morgan v. Sundance, Inc.*,
    596 U.S. 411 (2022) .............................................................................................. 10

*Motorola Credit Corp. v. Uzan*,
    388 F.3d 39 (2d Cir. 2004) .................................................................................. 10

*Nessim v. Fliff, Inc.*,
    23-cv-01048, 2024 WL 1600649 (C.D. Cal. Jan. 5, 2024) ............................... 22

*Pandolfi v. AviaGames, Inc.*,
    23-CV-05971-EMC, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024) .......... 18, 21

*Reading Health Sys. v. Bear Stearns & Co.*,
    900 F.3d 87 (3d Cir. 2018) .................................................................................... 4

*Rodgers-Rouzier v. Am. Queen Steamboat Operating Co.*,
    104 F.4th 978 (7th Cir. 2024) ............................................................................. 10

*Ruhrgas AG v. Marathon Oil Co.*,
    526 U.S. 574 (1999) ..................................................................................... 4, 5, 7

*SCPS LLC et al. v. Ben Travis Law et al.*,
    No. 2:25-cv-03255 (C.D. Cal.) ........................................................................... 17

*SCPS, LLC et al. v. Kind Law et al.*,
    No. 1:24-cv-02768 (D.D.C.) ............................................................................... 17

*SCPS, LLC et al. vs. Kind Law et al.*,
    No. 152508/2025 (N.Y. Sup Ct.) ................................................................... 8, 17

*SCPS, LLC v. Kind Law*,
    770 F. Supp. 3d 11 (D.D.C. 2025) .................................................................... 17

*Shebesh v. Geneanet, S.A.*,
    No. 23 CV 04195, 2024 WL 2019447 (N.D. Ill. May 3, 2024) ........................................ 4

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ......................................................................................... 4, 5, 7

*Smith v. Spizzirri*,
    601 U.S. 472 (2024) ......................................................................................... 5, 6, 7

*Vaden v. Discover Bank*,
    556 U.S. 49 (2009) ................................................................................................. 7

*Walker v. Walgreens Specialty Pharmacy, LLC*,
    No. 21 CV 5780, 2023 WL 5334609 (N.D. Ill. Aug. 18, 2023) ........................................ 4

## Statutes

720 ILCS 5/28-8 ............................................................................................................ 3
815 ILCS 505/1 ............................................................................................................. 3
9 U.S.C. § 5 .................................................................................................................. 6
9 U.S.C. §§ 201–208 ...................................................................................................... 1
9 U.S.C.A. § 4 ............................................................................................................... 7
U.S.C. § 201 ................................................................................................................ 11

## Other Authorities

Restatement (Second) of Conflict of Laws § 188(1) ................................................... 9
Restatement (Second) of Conflict of Laws § 188(2) ................................................... 9
Restatement (Second) of Conflict of Laws § 218 (1971) ............................................ 9

## Rules

Fed. R. Civ. P. 44.1 ...................................................................................................... 8

## Canadian Cases

*Bedard v. Isaac*,
    (1971) 2 O.R. 391 (Can. Ont.) *rev'd on other grounds*, (1973) S.C.R. 1349 .................. 12

*Difederico v. Amazon.com, Inc.*,
    2023 CAF 165 (Can.) ..................................................................................... 11

*Griffin v. Dell Canada Inc.*,
    2010 ONCA 29 (Ont. C.A.) ........................................................................................ 13, 19

*Lin v. Uber Canada Inc.*,
    2024 FC 977 (Can.) ........................................................................................................ 12

*R. v. Gagne*,
    1988 CarswellOnt 6025 (Can. Ont. Prov. Ct.) .............................................................. 12

*Smith v. Nat'l Money Mart Co.*,
    2005 CarswellOnt 2640 (Can. Ont. Sup. Ct. J.) (WL) .............................................. 21, 22

*TELUS Commc'ns. Inc. v. Wellman*,
    2019 SCC 19 (Can.) ..................................................................... 11, 13, 14, 20

*Transp. N. Am. Express Inc. v. New Solutions Fin. Corp.*,
    2004 SCC 7 (Can.) ..................................................................................... 20, 22

*Uber Techs. Inc. v. Heller*,
    2020 SCC 16 (Can.) ............................................................................. *passim*

*Williams v. Amazon.com Inc.*,
    2023 BCCA 314 (Can.) ................................................................................ 11

## Canadian Statutes/Other Authorities

OAA § 7(1) ................................................................................................................... 11
OCPA § 1 ..................................................................................................................... 12
OCPA § 7(2) ................................................................................................................. 12
S.O. 1991, c. 17 ............................................................................................................. 1
S.O. 2002, c. 30, Sch. A ............................................................................................... 1

## INTRODUCTION

Defendants Blazesoft Ltd. and Blazegames, Inc. (the "Owner Defendants") own and operate three online casinos: SSPS LLC d/b/a Sportzino, SCPS LLC d/b/a Zula Casino, and Social Gaming LLC d/b/a Fortune Coins (the "Casino Defendants"). Plaintiffs Vincent Ambrosia Jr. and Robert Houpt ("Plaintiffs") brought this action alleging that Defendants prey on consumers through addictive and illegal online gambling falsely marketed as free-to-play "sweepstakes." Plaintiffs seek relief under Illinois and Ontario law for themselves and a class of other consumers who lost money at Defendants' casinos.

Now, Defendants want to force each user into individual arbitrations that will cost more than the value of their claims and that may take decades to resolve—to illustrate, the arbitration clause bars claimants represented by the same or coordinating counsel from proceeding with similar claims at the same time. Defendants designed their arbitration clauses to effectively bar would-be claimants any relief and to instead insulate Defendants from liability for their illegal conduct. To attempt to enforce these arbitration clauses and to stay this case, Defendants invoke Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201–208 (the "FAA"). However, the Terms and Conditions expressly state that Ontario law applies, including the *Arbitration Act*, Ontario, S.O. 1991, c. 17 (the "Ontario Arbitration Act" or "OAA"). Ontario law, in turn, protects consumers from precisely this type of corporate abuse, wherein consumers are stripped of their rights to a judicial forum through adhesive contracts.

First, the Ontario Consumer Protection Act, S.O. 2002, c. 30, Sch. A (the "Ontario CPA" or "OCPA"), bars mandatory arbitration agreements in consumer contracts. Second, the arbitration agreement—which, among other things, effectively requires one arbitration to resolve before any similar claims are filed—is unconscionable. Third, the arbitration agreement is

1

contained in an illegal gambling contract and the Terms and Conditions are thus void *ab initio*. For these reasons, the arbitration clause is invalid, and Defendants' motion should be denied.

## BACKGROUND

Defendants Blazesoft and Blazegames own and operate three online casinos—Sportzino, Zula, and Fortune Coins—out of Ontario, Canada. (Dkt. 27 (the "FAC") ¶¶ 9–13, 17–18.) In order to access the casinos, users must agree to the Casino Defendants' Terms and Conditions. (*See generally* Dkts. 43-3; 43-13.)[1] The Terms and Conditions state that they "are governed by, and construed in accordance with, the laws of Ontario, Canada." (T&C § 13.1.) The Terms and Conditions also contain a lengthy arbitration clause, which similarly states that it is "governed by the *Arbitration Act*, Ontario"—*i.e.*, the OAA. (*Id.* § 12.3.) As Plaintiffs allege that the Owner Defendants are alter egos of the Casino Defendants, (*see* FAC ¶¶ 17–30), they do not contest that the arbitration clause in the terms, if enforced, would apply to the Owner Defendants.

The arbitration clause calls for disputes between the parties to be resolved by arbitration conducted by ADR Chambers, a Canadian alternative dispute resolution organization located in North York, Ontario. (T&C § 12.5.) One provision in the arbitration clause states that "arbitration shall be conducted via telephone or other remote means." (*Id.* § 12.6(a).) Another provision, however, states that "except as otherwise may be required by the [ADR Chambers Arbitration Rules], the arbitration will be held in Toronto, Ontario." (*Id.* § 12.6(e).)

The arbitration clause states that claims may not be brought as "part of a Collective Arbitration." (*Id.* § 12.6(b).) "Collective Arbitration" is not defined, but the clause states:

[A] claim to resolve a Dispute against [Defendants] will be deemed a Collective

---

[1] While there were different versions of the Terms and Conditions across the casinos at different times (*see* Dkt. 43, at 3 n.1), they were all updated and contain materially identical arbitration terms. Individuals had to "accept" these updated terms to continue using the platform or to access their funds. Like Defendants, Plaintiffs cite to the December 10, 2024, Zula Terms and Conditions, Exhibit J to the German Declaration (Dkt. 43-13.) Citations to the Terms and Conditions will be in the form "T&C § __."

> Arbitration if: (a) two (2) or more similar claims for arbitration are pending concurrently by or on behalf of one or more claimants; and (b) counsel for two or more claimants are same [sic], share fees or coordinate in any way across the arbitrations.

(*Id.* § 12.6(b).) The arbitration clause also explicitly bars class arbitration. (*Id.* § 12.9.)

The arbitration clause provides that consumers may opt out of arbitration if they mail a letter to a PO Box in Ontario within thirty days of first agreeing to the most recent version of Defendants' Terms and Conditions. (*Id.* § 12.7.) In other words, a user must opt out each time the terms are modified. Furthermore, the arbitration clause also states that "[i]f [consumers] do not agree to this Arbitration Agreement, then [they] may not access or use [Defendants'] Service or Website[,]" negating the opt-out clause entirely. (*Id.* § 12.1.)

Plaintiffs Ambrosia and Houpt were Sportzino, Zula, and Fortune Coins users in Illinois. (FAC ¶¶ 7–8, 92–97.) They allege that Defendants' online casinos constitute illegal gambling operations falsely marketed as free-to-play "sweepstakes." (*Id.* ¶¶ 40–91.) In each casino, users can buy and wager coins that can be redeemed for real money at a 1:1 exchange rate to the U.S. Dollar. (*Id.* ¶ 51.) On behalf of a nationwide class and two Illinois subclasses, Plaintiffs sued Defendants seeking recovery of the money they lost wagering at Defendants' illegal online casinos. They brought one count under the Illinois Loss Recovery Act, 720 ILCS 5/28-8, one count under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, one count under common law principles of unjust enrichment, and two counts under the Ontario CPA. (FAC ¶¶ 106–79.)

Defendants moved to compel arbitration and stay the litigation. (Dkt. 42.) On the same day, the Owner Defendants moved to dismiss the FAC for lack of personal jurisdiction. (Dkt. 44.) This Court entered and continued the motion to dismiss, ordering the parties to brief the arbitration motion first. (Dkt. 51.) Nevertheless, the Court invited Plaintiffs to fully brief the

argument that the personal jurisdiction issue should be resolved before ruling on the motion to compel in the instant brief. (Dkt. 53-1, June 17, 2025, Hrg. Tr. at 9–10.)

## ARGUMENT

Defendants' motion to compel arbitration should be denied. Before reaching the merits of Defendants' motion, however, this Court should satisfy itself that it can properly exercise personal jurisdiction over all the Defendants.

## I.    THIS COURT SHOULD RESOLVE PERSONAL JURISDICTION BEFORE RULING ON DEFENDANTS' MOTION.

A court cannot rule on a motion to compel arbitration without first establishing personal jurisdiction. While the Seventh Circuit has not explicitly addressed this issue, the Third and Fifth Circuits have found that resolution of a motion to compel arbitration requires a court to "apply its law-declaring power" such that it must first establish personal jurisdiction over the parties. *Hines v. Stamos*, 111 F.4th 551, 565 (5th Cir. 2024); *Reading Health Sys. v. Bear Stearns & Co*., 900 F.3d 87, 95 (3d Cir. 2018); *see also Shebesh v. Geneanet, S.A.*, No. 23 CV 04195, 2024 WL 2019447, at *1 (N.D. Ill. May 3, 2024) (declining to rule on motion to compel because of lack of personal jurisdiction); *Walker v. Walgreens Specialty Pharmacy, LLC*, No. 21 CV 5780, 2023 WL 5334609, at *5 n.7 (N.D. Ill. Aug. 18, 2023) (addressing personal jurisdiction before motion to compel). This comports with black-letter law that "[p]ersonal jurisdiction, too, is an essential element of district court jurisdiction, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co*., 526 U.S. 574, 575 (1999); *see also Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp*., 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over . . . the parties (personal jurisdiction).").

Courts do have "leeway 'to choose among threshold grounds for denying audience to a

4

case on the merits,'" such as choosing to dismiss a case for lack of personal jurisdiction prior to reaching subject matter jurisdiction, or vice-versa. *Sinochem*, 549 U.S. at 431 (quoting *Ruhrgas*, 526 U.S. at 585). However, compelling arbitration is not one of these "threshold" grounds. The Supreme Court placed limits on the leeway afforded to courts, expressly recognizing that courts can choose amongst grounds on which to grant *dismissal*, the effect being that the court "will not proceed at all to an adjudication of the cause." *Id.* at 431 (quotations omitted). Recently, the Supreme Court held that courts must *stay*, not dismiss, cases when granting motions to compel arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Thus, far from denying an audience to the case, a court granting a motion to compel arbitration retains the case indefinitely—and exercises jurisdiction over the parties to it.

As compelling arbitration is not grounds for dismissal, a motion to compel cannot be one of the "threshold" issues that may be determined before jurisdiction is established. This is especially true where, as Defendants claim here, (Dkt. 43, at 11), the parties must arbitrate the question of arbitrability. Any claims that the arbitrator determines are not arbitrable would return to the court to proceed on the merits. Because compelling arbitration does not preclude the possibility of a merits determination, it is fundamentally different from the other "threshold" issues discussed in *Sinochem* and *Ruhrgas*.

Even if no issues are sent back to the court for proceedings on the merits, the court still retains jurisdiction during the stay—which presupposes that the court had jurisdiction in the first place. *See Davis v. Fenton*, 857 F.3d 961, 963 (7th Cir. 2017) ("Because her suit had been stayed, not dismissed, the court, by virtue of having jurisdiction over the original lawsuit, retained jurisdiction not only over her request to confirm the award but also over her federal-law claims."). Retention of jurisdiction is not merely a formality. As the Supreme Court has

5

recognized, the FAA "envisions" that courts will play an active "supervisory role" over arbitration:

> The FAA provides mechanisms for courts *with proper jurisdiction* to assist parties in arbitration by, for example, appointing an arbitrator, see 9 U.S.C. § 5; enforcing subpoenas issued by arbitrators to compel testimony or produce evidence, see § 7; and facilitating recovery on an arbitral award, see § 9.

*Smith*, 601 U.S. at 478 (emphasis added).

To perform this "supervisory role" courts need both subject matter jurisdiction *and* personal jurisdiction. For example, a court must have personal jurisdiction over the parties to enforce an arbitral award. *See Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 394 n.2 (7th Cir. 2002) (recognizing that party seeking confirmation of arbitration award was not contesting personal jurisdiction); *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co*., 284 F.3d 1114, 1120-21 (9th Cir. 2002) (holding that district court must establish personal jurisdiction before confirming arbitration awards); *cf. CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 145 S. Ct. 1572 (2025) (reversing dismissal of suit to confirm arbitral award because district court had personal jurisdiction over defendant).

Accordingly, Defendants' contention during the status conference that granting their motion to compel arbitration would moot any jurisdictional challenge, (Dkt. 53-1, at 3), is incorrect. Rather, granting the motion to compel arbitration without resolving personal jurisdiction would put this Court in the precarious position of supervising an arbitration between parties that Defendants claim the Court has no jurisdiction over. And down the line, the Court may be asked to enforce, vacate, or modify an arbitral award, only to find that—in Defendants' view—it has no jurisdiction to do so. If Defendants' position was adopted, courts' dockets would be cluttered with cases in arbitration over which they have no authority. This would not serve the ends of efficiency or preservation of judicial resources.

6

Finally, during the status hearing, Defendants argued that motions to compel arbitration are like venue motions, and venue typically is a "threshold" ground that can be determined prior to jurisdiction. (Dkt. 53-1, at 4–6.) This comparison is inapt because a dismissal based on *forum non conveniens* or a transfer under § 1404 leaves the original court with no role to play in any further litigation. *See Sinochem*, 549 U.S. at 432. Therefore, there is no need for the court to determine whether it had jurisdiction in the first place. As discussed above, however, courts compelling arbitration must stay, rather than dismiss, the case. *Smith*, 601 U.S. at 478. Accordingly, the Court must have jurisdiction over the parties in the first place to retain jurisdiction during a stay.

Similarly, courts may decide venue issues before establishing subject matter jurisdiction, *Sinochem*, 549 U.S. at 432, but courts must establish subject matter jurisdiction before deciding a motion to compel arbitration. 9 U.S.C.A. § 4 (a party may petition "any United States district court which, save for such agreement, *would have jurisdiction under title 28* . . . for an order directing that such arbitration proceed in the manner provided for in such agreement.") (emphasis added); *Am.'s MoneyLine, Inc. v. Coleman*, 360 F.3d 782, 784 (7th Cir. 2004) (recognizing that to compel arbitration, "there must be diversity of citizenship or some other independent basis for federal jurisdiction."); *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009) (noting that the FAA does not supply subject matter jurisdiction).

If an arbitration motion cannot be addressed before establishing subject matter jurisdiction, there is no reason why it should be considered a "threshold" issue that can be determined before establishing personal jurisdiction. *See Ruhrgas*, 526 U.S. at 584 (affirming that personal jurisdiction "is an essential element of the jurisdiction of a district ... court, without which the court is powerless to proceed to an adjudication.") (quotations omitted). The fact that

personal jurisdiction *can* be waived is irrelevant here because the Owner Defendants are actively

contesting personal jurisdiction. If Defendants insist that the arbitration motion be decided before

the jurisdictional motion, then the Owner Defendants should be deemed to have waived their

objection to personal jurisdiction. *See Derse Inc. v. Haas Outdoors Inc*., No. 09-CV-97, 2011

WL 554060, at *4 (E.D. Wis. Feb. 4, 2011) (finding defendant likely "estopped" from contesting

personal jurisdiction after filing motion to compel arbitration); *Blockowicz v. Williams*, 630 F.3d

563, 566 (7th Cir. 2010) (noting defendant can waive jurisdictional defenses through conduct

even if objection to personal jurisdiction was previously raised).

## II. ONTARIO LAW—INCLUDING THE ONTARIO ARBITRATION ACT— GOVERNS DEFENDANTS' ARBITRATION MOTION.

Moving to the merits, Defendants purport to bring their motion under Chapter 2 of the

FAA. Defendants fail to mention, however, that the arbitration clause they seek to enforce

expressly states that it is "governed by the *Arbitration Act*, Ontario," (T&C § 12.3), and that

"[a]ll issues and questions concerning the construction, validity, interpretation and enforceability

of [the Terms and Conditions containing the arbitration agreement] . . . are governed by, and

construed in accordance with, the laws of Ontario, Canada," (*id.* § 13.1).[2] Resolution of

Defendants' motion is thus governed not by the FAA, but by the Ontario Arbitration Act.[3]

As a federal court sitting in diversity, this Court applies Illinois choice-of-law rules.

*Midwest Grain Prods. of Ill., Inc. v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000)

---

[2]     Notably, Sportzino filed retaliatory arbitrations with ADR Chambers against claimants who filed arbitration claims against Sportzino with the AAA. In those initiating documents, Sportzino argued that Ontario law applies. *See SCPS, LLC et al. v. Kind Law et al.*, No. 152508/2025, Dkt. 121 at 7 (N.Y. Sup Ct.) (for the Court's convenience, this filing is included in Exhibit B, attached hereto). Defendants cannot invoke their own choice of law clause when it benefits them and ignore it when it does not.

[3]     The Court may make determinations on foreign law, and any such determinations "must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1. Furthermore, as Defendants' Canadian law expert explained, in Canada, there is a single common law applicable in all provinces, of which the Supreme Court of Canada is the final arbiter. (Dkt. 43-17, ¶ 18.)

(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Illinois follows the

Second Restatement in making choice-of-law determinations. *Id.* Under the Second Restatement:

> The validity of an arbitration agreement, and the rights created thereby, are determined by the law selected by application of the rules of §§ 187–188. This law determines whether a judicial action brought in violation of the provisions of an arbitration agreement can be maintained.

Restatement (Second) of Conflict of Laws § 218 (1971). Section 187 in turn provides that:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

*Id.* § 187(1). Here, not only *could* the parties have included an explicit provision stating that

Ontario law governs the validity and enforceability of the arbitration clause, the Terms and

Conditions *did* include such an explicit provision. (T&C § 12.3.)

Additionally, even if the Terms and Conditions' express choice of Ontario law did not

apply, the Second Restatement would still point to Ontario law. Absent an effective choice of

law by the parties, the enforceability of an arbitration agreement is governed by the law of the

jurisdiction that has the "most significant relationship" to that issue. Restatement (Second) of

Conflict of Laws § 188(1). Because Defendants operate their online casinos out of Ontario, (FAC

¶¶ 9–13, 30), and because the arbitration agreement calls for arbitration to be administered by

ADR Chambers in Ontario, (T&C §§ 12.5, 12.6(e)), Ontario has the most significant relationship

to the arbitration issue. Restatement (Second) of Conflict of Laws § 188(2) and cmt. e; *see also*

Dkt. 43, at 9–10 (agreeing that the arbitration agreement has a significant relationship with

Ontario). Thus, whether by operation of the express Ontario choice-of-law provisions or because

Ontario has the most significant relationship to the arbitration issues, Illinois choice-of-law rules

provide that Ontario law—not the FAA—governs Defendants' motion.[4]

Furthermore, while the FAA preempts application of conflicting *state* law, *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co.*, 104 F.4th 978, 985 (7th Cir. 2024), it does not preempt application of conflicting *foreign* law. Preemption doctrine stems from the Supremacy Clause and provides a rule of decision for determining whether federal or state law applies in a particular situation. *McHenry Cnty. v. Raoul*, 44 F.4th 581, 587 (7th Cir. 2022). It does not apply to conflicts between federal and foreign law. In any case, application of the Ontario Arbitration Act does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of" the FAA. *Id.* at 591 (describing conflict preemption).[5] The so-called "policy favoring arbitration" does not "favor arbitration over litigation," but "is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreement to arbitrate and to place such agreements on the same footing as other contracts." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). In other words, the purpose and objective of the FAA is simply to enforce arbitration agreements according to their terms. Here, the arbitration clause's terms expressly provide that its enforceability and validity will be determined by Ontario law, specifically the Ontario Arbitration Act. Simply put, Ontario law governs resolution of this motion. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004) ([R]especting the parties' choice of law is fully consistent with the purposes of the FAA . . . [I]f defendants wish to invoke the arbitration clauses in the agreements at issue, they

---

[4]      Illinois recognizes the doctrine of dépeçage, whereby the laws of different jurisdictions can apply to different issues in the same case. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 809 n.4 (7th Cir. 2020). By arguing that Ontario law governs Defendants' arbitration motion here, Plaintiffs do not concede that Ontario law governs all issues in this case—especially noncontractual issues, such as the merits of their statutory and common law claims on behalf of the proposed Illinois subclasses.

[5]      Conflict preemption is the only type of preemption applicable to the FAA. The FAA does not expressly preempt state (or foreign) law, and "the FAA does not occupy the field of arbitration." *Rodgers-Rouzier*, 104 F.4th at 985.

must also accept the Swiss choice-of-law clauses that govern those agreements.").

## III. THE ARBITRATION CLAUSE IS UNENFORCEABLE UNDER THE ONTARIO ARBITRATION ACT.

The Ontario Arbitration Act provides that a defendant may seek to stay litigation proceedings if the dispute is subject to an arbitration agreement. OAA § 7(1). However, a "court may refuse to stay the proceeding [where] … [t]he arbitration agreement is invalid." *Id.* § 7(2). Here, the arbitration clause is invalid—and Defendants' motion should therefore be denied—for three, independent, reasons: it is barred by the Ontario CPA, it is unconscionable, and it is part of an illegal gambling contract.[6]

### A. The Arbitration Clause Is Barred by the Ontario CPA.

The arbitration clause is invalid because mandatory arbitration agreements in consumer contracts are prohibited by the Ontario CPA. *TELUS Commc'ns. Inc. v. Wellman*, 2019 SCC 19, ¶ 97 (Can.) (noting that the Ontario CPA "constitute[s] a legislative override of . . . consumer arbitration agreements[]") (quotations omitted); *Difederico v. Amazon.com, Inc.*, 2023 CAF 165, ¶ 80 (Can.) ("[I]n Ontario, section 7 of the [Ontario CPA] declares mandatory arbitration clauses invalid . . ."); *Williams v. Amazon.com Inc.*, 2023 BCCA 314, ¶ 174 (Can.) ("Ontario, Quebec, and Saskatchewan have expressly prohibited mandatory arbitration agreements and class waivers" in the consumer context).[7] As the Supreme Court of Canada has explained, "the Ontario legislature . . . made a careful policy choice to exempt consumers—and *only* consumers—from the ordinary enforcement of arbitration agreements." *TELUS*, 2019 SCC 19, ¶ 80. Thus, while an

---

[6] Even if the FAA rather than the OAA applied, the invalidity of the arbitration clause would preclude its enforcement. As Defendants note, the FAA incorporates the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention"). (Dkt. 43, at 1 (citing 9 U.S.C. § 201).) The Convention provides that a court shall enforce an arbitration agreement "unless it finds that the said agreement is null and void, inoperative or incapable of being performed." Convention, Art. II ¶ 3.

[7] For the Court's convenience, all Canadian case citations are attached as Exhibit A.

arbitration agreement would normally require a stay of litigation, the Ontario CPA "offers . . . consumers a key to the courtroom." *Id.* ¶ 97. It "expressly shields consumers from a stay of proceedings under the [OAA]," and "[c]onsequently, they are free to pursue their claims in court." *Id.* ¶ 4.

> The Ontario CPA states:
>
> [A]ny term or acknowledgement in a consumer agreement or a related agreement that requires or has the effect of requiring that disputes arising out of the consumer agreement be submitted to arbitration is invalid insofar as it prevents a consumer from exercising a right to commence an action in the Superior Court of Justice given under this Act.

OCPA § 7(2). The Terms and Conditions here are a "consumer agreement" under the act because Plaintiffs are "consumers" ("individual[s] acting for personal . . . purposes"); Defendants are "suppliers," as they are "in the business of supplying goods or services;" and the Terms & Conditions govern Defendants' supply of "services." OCPA § 1 (defining terms). The arbitration clause in the Terms & Conditions requires that disputes arising out of the consumer agreement be submitted to arbitration, and that arbitration clause prevents consumers from exercising their right to commence actions in any court—including the Superior Court of Justice. (T&C § 12.) It is therefore invalid under the Ontario CPA, and no stay is warranted.

Defendants may point to a Canadian federal court decision that held that the Ontario CPA protects only actions "commenced before the Ontario Superior Court of Justice under the Ontario Consumer Protection Act." *Lin v. Uber Canada Inc.*, 2024 FC 977, ¶ 65 (Can.). But as a non-precedential decision of a lower federal court, *Lin* is not binding on issues of Ontario law. *See R. v. Gagne*, 1988 CarswellOnt 6025, ¶ 20 (Can. Ont. Prov. Ct.); *Bedard v. Isaac*, (1971) 2 O.R. 391, ¶ 17 (Can. Ont.) *rev'd on other grounds*, (1973) S.C.R. 1349.

Nor is *Lin* particularly persuasive. That case relied on an overly narrow textualist

interpretation of the Ontario CPA to deny its application in courts other than the Ontario Superior Court of Justice, even in cases otherwise governed by Ontario law. But as the Supreme Court of Canada instructs, the "modern approach to statutory interpretation [requires that] the words of an Act are to be read *in their entire context* and in their grammatical and ordinary sense *harmoniously with the scheme of the Act, the object of the Act, and the intention of the Parliament*." *TELUS*, 2019 SCC 19, ¶ 47 (emphasis added). Here, the scheme of the OCPA, the object of the OCPA, and the intention of the Ontario legislature was to address the principal problem that arises when mandatory arbitration agreements are inserted into consumer contracts of adhesion: defendants' de facto immunity from suit. *See Griffin v. Dell Canada Inc.*, 2010 ONCA 29, ¶¶ 28–31 (Ont. C.A.) As the Ontario Court of Appeal explained, "[defendants'] stated preference for arbitration is often nothing more than a guise to avoid liability for widespread low-value wrongs that cannot be litigated individually but when aggregated form the subject of a viable class proceeding." *Id.* ¶ 30. "The enactment of the CPA reflects the legislature of Ontario's determination that problems arise when [mandatory arbitration clauses are enforced] in the consumer setting." *Id.* ¶ 29. These "[c]oncerns about the unfairness of mandatory arbitration clauses led the Ontario legislature to enact the *CPA* provisions outlawing mandatory arbitration clauses in consumer agreements." *Id.* ¶ 31. The Ontario CPA, "considered in its full context[,]" *TELUS*, 2019 SCC 19, ¶ 47, does not warrant following the *Lin* court's overly narrow reading of the statute. The Ontario CPA's ban on mandatory arbitration clauses in consumer agreements applies here, rendering the arbitration clause invalid and unenforceable.

### B. The Arbitration Clause Is Unconscionable.

A second, independent, reason why the arbitration clause is invalid and unenforceable is because it is unconscionable. *See TELUS*, 2019 SCC 19, ¶ 85 (noting that unconscionability of

an arbitration agreement "would render it invalid and thereby provide a basis for refusing a stay pursuant to s. 7(2)2 of the *Arbitration Act*"). "Unconscionability is widely accepted in Canadian contract law." *Uber Techs. Inc. v. Heller*, 2020 SCC 16, ¶ 55 (Can.). Under Canadian law, unconscionability has two elements: "an inequality of bargaining power and a resulting improvident bargain." *Id.* ¶ 65. Both elements exist here. Furthermore, contrary to Defendants' suggestion, this Court—not an arbitrator—should decide unconscionability.

## 1. The Parties had unequal bargaining power.

The first element of unconscionability—inequality of bargaining power—can hardly be disputed. As the Supreme Court of Canada explained, one "common example of an inequality of bargaining power is where, as a practical matter, only one party could understand and appreciate the full import of the contractual terms, creating a type of 'cognitive asymmetry.'" *Heller*, 2020 SCC 16, ¶ 71. "This may occur . . . because of disadvantages specific to the contracting process, such as the presence of dense or difficult to understand terms in the parties' agreement." *Id.* Ultimately, "what matters is the presence of a bargaining context 'where the law's normal assumptions about free bargaining . . . no longer hold substantially true[.]'" *Id.* ¶ 72.

In *Heller*, which involved a dispute between Uber and a driver, the court held:

> There was clearly inequality of bargaining power between Uber and Mr. Heller. The arbitration agreement was part of a standard form contract. Mr. Heller was powerless to negotiate any of its terms. His only contractual option was to accept or reject it. There was a significant gulf in sophistication between Mr. Heller, a food deliveryman in Toronto, and Uber, a large multinational corporation.

*Id.* ¶ 93.

The circumstances are similar here. Defendants—profit-focused corporations presumably assisted by teams of lawyers—drafted the Terms and Conditions and designed contract-forming login screens that Plaintiffs—relatively unsophisticated laypersons—needed to click through

14

before accessing Defendants' online casinos. (*See generally*, Dkts. 43-3 through 43-7.) When printed, the Terms and Conditions comprise twenty-two pages of "dense or difficult to understand terms[,]" *Heller*, 2020 SCC 16, ¶ 71, five of which are taken up by the arbitration clause alone, (Dkt. 43-13). Plaintiffs had no opportunity to negotiate these terms and were forced to agree to them in order to access or continue playing Defendants' highly addictive gambling sites. *See Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1062 (W.D. Wash. 2019) (finding pop-up asking online casino users to agree to new terms coercive, noting that "[t]his ultimatum is made more coercive by the addictive nature of [the casino's] games and the fact that many players have already purchased chips that can only be accessed by agreeing to the terms.") "In these cases, the law's assumption about self-interested bargaining loses much of its force." *Heller*, 2020 SCC 16, ¶ 71.

Defendants point to an opt-out provision in the arbitration clause to suggest that Plaintiffs had some agency in accepting the Terms and Conditions. (Dkt. 43, at 1, 11–12.) But while the arbitration clause purports to provide a narrow opt-out mechanism, (T&C § 12.7), it *also* states expressly that "[i]f you do not agree to this Arbitration Agreement, then you may not access or use the Service or Website," (*id.* § 12.1). This means, among other things, an inability to log on to cash out funds stored in one's account. Even assuming there were some way to read these conflicting provisions harmoniously, they only further illustrate the "dense or difficult to understand terms" of the arbitration agreement. *Heller*, 2020 SCC 16, ¶ 71.[8] What's more, opting

---

[8] Other difficult-to-understand terms in the arbitration clause include the contradictory provisions regarding whether arbitration must be held in person in Ontario or may be held telephonically, (*compare* T&C § 12.6(a) *with id.* § 12.6(e)), and a provision stating that in certain circumstances, "the Commercial Arbitration Rules shall apply and, as appropriate, the Supplementary Rules for Class Action of the ADRmay [sic] apply," (*id.* § 12.6(c)). Plaintiffs' counsel was unable to locate any Commercial Arbitration Rules or Supplementary Rules of Class Action on the ADR Chambers website. Furthermore, the terms state that arbitration fees will be governed by the ADR rules, (*id.* § 12.6(d)), but do not state what the fee is. *Heller*, 2020 SCC 16, ¶ 93 (hidden fees contributed to inequality of bargaining power).

out is not permanent; under a plain reading of the opt-out provision, a user must opt-out anew after accepting any updated version of the terms of service. *See, e.g.*, *Kennedy v. VGW Holdings Limited, et al.*, 1:24-CV-2184-TWT, 2025 WL 1932750, at *6 (N.D. Ga. Jul. 14, 2025) (granting gambling website operator's motion to compel when Plaintiff opted out of arbitration in one set of terms but not subsequent set a month later). The "choice" provided to users is anything but.

Simply put, there was a vast gulf in the sophistication and bargaining power of the parties here, and "the law's normal assumptions about free bargaining [thus] no longer hold substantially true." *Heller*, 2020 SCC 16, ¶ 72. "In these circumstances, courts can provide relief from a bargain that is improvident for the weaker party in the contracting relationship." *Id.*

### 2. The resulting bargain was improvident.

The second element of unconscionability—an improvident bargain—is also met here. "A bargain is improvident if it unduly advantages the stronger party or unduly disadvantages the more vulnerable [party]." *Id.* ¶ 74. The arbitration clause here does both for two reasons.

### a. The bar on "Collective Arbitration" renders relief realistically unattainable.

First, the arbitration clause bars Plaintiffs from bringing claims in arbitration "as part of a Collective Arbitration." (T&C § 12.6(b).) A "Collective Arbitration" is deemed to include "two (2) or more similar claims for arbitration [that] are pending concurrently by or on behalf of one or more claimants [where] counsel for two or more claimants are same [sic], share fees or coordinate in any way across the arbitrations." (*Id.*) In other words, two consumers who share the same or coordinating counsel cannot proceed with arbitrations against Defendants at the same time. Thus, for example, if Mr. Ambrosia initiated an arbitration against Defendants, Mr. Houpt could not initiate one until Mr. Ambrosia's arbitration was complete (unless Mr. Houpt secured different, independent counsel and in no way coordinated with Mr. Ambrosia). Even if ADR

Chambers' Expedited Arbitration Rules applied—which is not necessarily a warranted assumption—that wait would be at least three months.[9] That unnecessary delay is bad enough, but Plaintiffs allege that there are tens of thousands of consumers with similar claims. (FAC ¶ 99.) If each of those consumers had to arbitrate their claims sequentially, they would have to wait over 2,500 years to be heard. This is hardly theoretical. Approximately 1,000 claimants have already filed arbitrations against Sportzino and Zula.[10] *SCPS, LLC v. Kind Law*, 770 F. Supp. 3d 11, 17 (D.D.C. 2025). The bar on collective arbitrations would force the last of the consumers to wait 250 years before having their claim heard.

Similar arbitration provisions have been held unconscionable. In *MacClelland v. Cellco Partnership*, 609 F. Supp. 3d 1024 (N.D. Cal. 2022), for example, an arbitration agreement provided that only ten claimants raising similar claims and represented by the same counsel could be arbitrated at a time. *Id.* at 1040. Assuming seven-month arbitrations (the average disposition time for the arbitration provider there), "it would take approximately 156 years to

---

[9] ADR Chambers states that its expedited arbitration process takes less than 90 days. *ADR Chambers*, Expedited Arbitration (last visited July 18, 2025), adrchambers.com/expedited-arbitration. However, these rules "apply whenever the parties agree in writing to have their dispute decided 'under the Expedited Arbitration Rules of ADR Chambers' or words to that effect."' *ADR Chambers*, Expedited Arbitration Rule 1 (last visited July 18, 2025), adrchambers.com/expedited-arbitration/rules/#arbitration-under-these-rules. The arbitration clause here contains no such reference.

[10] These arbitrations are on hold pending resolution of three lawsuits filed by the Casino Defendants against the law firms representing the arbitration claimants. *See SCPS, LLC et al. vs. Kind Law et al.*, No. 152508/2025 (N.Y. Sup Ct.); *SCPS LLC et al. v. Ben Travis Law et al.*, No. 2:25-cv-03255 (C.D. Cal.); *SCPS, LLC et al. v. Kind Law et al.*, No. 1:24-cv-02768 (D.D.C.). The experience of these claimants— who have faced a spate of retaliatory actions after filing arbitration claims against the Casino Defendants—exacerbates the concerns Plaintiffs raise in this brief: Filings in connection with the New York case reveal that, after the arbitrations were filed, the Casino Defendants filed counter-arbitrations against claimants and, more egregiously, the Casino Defendants' counsel emailed the claimants directly (without their counsels' permission) notifying them of the counter-arbitrations. *See SCPS, LLC et al. v. Kind Law et al.*, No. 152508/2025, Dkt. 98, ¶ 47; Dkt. 121 (N.Y. Sup Ct.). Furthermore, the Casino Defendants messaged the claimants notifying them that their accounts had been suspended—holding hostage any money in their accounts at the time—and demanding that the claimants recant their representation by the defendant law firms and abandon their arbitration claims. *Id.* at Dkt. 144, at 4-5; *id.* at Dkt 98, ¶¶ 40-41; *id.* at Dkts. 116-117, 119. The filings cited in this footnote are included in Exhibit B.

resolve the claims of all of Plaintiffs' counsel's clients." *Id.* The court held that requiring plaintiffs "to wait months, more likely years before they can even submit a demand for arbitration [was] 'unreasonably favorable' to [defendant]" and therefore unconscionable. *Id.* at 1042. Likewise, *Pandolfi v. AviaGames, Inc.*, 23-CV-05971-EMC, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024), found an arbitration provision unconscionable where arbitration of similar claims brought by claimants represented by coordinated counsel was limited to twenty cases at a time. *Id.* at *6. As that court noted, "[the] prospect of delay . . . has a chilling effect on [potential claimants], deterring them from vindicating their rights." *Id.*

It is no answer to say that claimants can simply secure separate counsel. To do so "affects the right to counsel of their choice or indeed, the ability to find any counsel at all: where the individual claims are small (as consumer claims often are), it may be difficult to find an attorney who represents only a single or small number of similarly situated clients." *Pandolfi*, 2024 WL 4051754, at *11. "[T]he practical reality is that claims based on a company-wide policy affecting consumers will often be brought by law firms that represent a multitude of claimants, especially when the dollar amounts are small." *Id.* at *6. Furthermore, the Hobson's choice between less-favored counsel and untenable delay is faced only by potential claimants, not Defendants. While claimants can't initiate arbitration against Defendants if another claimant represented by the same counsel already has an arbitration proceeding pending, Defendants are "apparently free to select the same law firm to represent [them] in all of [their] arbitrations." *MacClelland*, 609 F. Supp. 3d at 1042. Defendants are thus "able to enjoy all of the advantages that come from being a 'repeat player,' while law firms representing [more than one] of [Defendant's] customers may be forced to sideline" those extra clients. *Id.* at 1043; *see also Pandolfi*, 2024 WL 4051754, at *7 (finding such "built-in asymmetry" unconscionable).

As the Supreme Court of Canada has explained, "[r]espect for arbitration is based on it being a cost-effective and efficient method of resolving disputes." *Heller*, 2020 SCC 16, ¶ 97. "When arbitration is realistically unattainable"—because of literal lifetimes of delay or an inability to secure adequate counsel—"it amounts to no dispute resolution mechanism at all." *Id.*

> **b.** **The bar on class arbitration renders relief realistically unattainable.**

In addition to barring collective arbitration, the arbitration clause also bars class arbitration. (T&C § 12.9 ("Any arbitration shall be conducted in the individual capacities of the parties only. No class action or other representative action will be undertaken.").) But as the Ontario Court of Appeal recognized in *Griffin*, "[c]lauses that require arbitration and preclude the aggregation of claims have the effect of removing consumer claims from the reach of class actions." 2010 ONCA 29, ¶ 30. And individually small-value consumer claims—like those at issue here—are often not viable in the absence of class proceedings:

> [S]uppliers and sellers regularly insert arbitration clauses in order to defeat claims rather than out of a genuine desire to arbitrate disputes with consumers. Such disputes often involve small claims that are not individually viable. Such claims only become viable if they can be aggregated by way of a class proceeding.

*Id.* ¶ 29. Indeed, as discussed above, that's precisely what "led the Ontario legislature to enact the *CPA* provisions outlawing mandatory arbitration clauses in consumer agreements." *Id.* ¶ 31.

Here, the ADR rules require that the claimant pay a non-refundable $500 filing fee, and the arbitrators' hourly fees range from $250 to $800 per hour. ADR Chambers, Arbitration Fees, https://adrchambers.com/arbitration/fees/ (last visited July 18, 2025). The initial filing fee alone greatly overshadows Mr. Houpt's losses in each of the three casinos ($100 to $350), and the hourly fee would soon eclipse Mr. Ambrosia's losses. (FAC ¶¶ 94, 97.) Accordingly, "[t]he costs are disproportionate to the size of an arbitration award," effectively rendering users' substantive

rights unenforceable and "depriving them of remedies." *Heller*, 2020 SCC 16, ¶¶ 90, 94-95.

Furthermore, even if this Court finds that the Ontario CPA doesn't *directly* render the arbitration clause unenforceable in this Court, the underlying concerns motivating the act still illustrate why the arbitration clause is an improvident (and thus unconscionable) bargain for Plaintiffs. *See TELUS*, 2019 SCC 19, ¶ 85 (suggesting that "arguments over any potential unfairness resulting from the enforcement of arbitration clauses contained in standard form contracts are better dealt with directly through the doctrine of unconscionability.").

Because the parties' unequal bargaining power resulted in an improvident bargain, this Court should hold the arbitration clause unconscionable and refuse to enforce it.[11]

### 3. This Court—not an arbitrator—decides unconscionability.

Defendants argue that the question of unconscionability should be decided by an arbitrator, not this Court, because of a delegation clause in the arbitration agreement. (Dkt. 43, at 11.) But Defendants' argument is based on the FAA, not the OAA. Under the Ontario Arbitration Act, courts decide threshold questions like unconscionability where "the necessary legal conclusions can be drawn from facts that are either evident on the face of the record or undisputed by the parties." *Heller*, 2020 SCC 16, ¶ 36. As demonstrated above, unconscionability can be determined solely by looking to the arbitration agreement and undisputed facts and can therefore be resolved by this Court.

---

[11]     Nor should the Court attempt to save the arbitration clause by severing unconscionable provisions. Canadian law "vest[s] the greatest possible amount of remedial discretion in judges" to address problematic contracts. *Transp. N. Am. Express Inc. v. New Solutions Fin. Corp.*, 2004 SCC 7, ¶ 40 (Can.) The spectrum of available remedies runs from minor blue-pencil tweaks to holding the entire contract void. *Id.* Where, as here, "Defendants engaged in a systematic effort to impose arbitration as an inferior forum[,]" the Court should find the entire arbitration clause unenforceable. *Heckman v. Live Nation Entm't, Inc.*, 120 F.4th 670, 688 (9th Cir. 2024) (quotations and omissions omitted). This was the approach taken by the Supreme Court of Canada in *Heller*, which found an arbitration agreement unenforceable over a dissenting justice's call for severance of unconscionable terms. *See* 2020 SCC 16, ¶ 321 (Côté, J., dissenting).

Furthermore, even if the delegation clause were considered, the delegation clause itself is unconscionable (and therefore unenforceable) for precisely the same reasons as the arbitration clause: it was an improvident bargain resulting from vastly unequal bargaining power. More to the point, the delegation clause suffers from exactly the same defects as the arbitration clause more generally. If unconscionability itself has to be arbitrated, the bars on collective arbitration and class arbitration render obtaining relief on the unconscionability question realistically unattainable. And as the Supreme Court of Canada has explained, "a court should not refer a *bona fide* challenge to an arbitrator's jurisdiction to the arbitrator if there is a real prospect that doing so would result in the challenge never being resolved." *Heller*, 2020 SCC 16, ¶ 46; *see also Heckman*, 120 F.4th at 688 (delegation clause and arbitration clause procedurally and substantively unconscionable for same reasons); *Pandolfi*, 2024 WL 4051754, at *11 (same).

### C. The Arbitration Agreement Is Part of an Unlawful Gambling Contract.

Finally, the third reason why the arbitration clause is invalid is that it is contained in an illegal gambling contract. Under Ontario law, an arbitration agreement that is part of an illegal contract is invalid and unenforceable. *Smith v. Nat'l Money Mart Co.*, 2005 CarswellOnt 2640, ¶¶ 28–30 (Can. Ont. Sup. Ct. J.) (WL). In *Smith*, for example, an Ontario Superior Court denied a motion to stay litigation under the OAA where the arbitration clause was contained in a payday loan contract that the plaintiff alleged was illegal. *Id.*

Plaintiffs allege that Defendants' online casinos constitute illegal gambling under both Ontario and Illinois law. (FAC ¶¶ 44, 64, 106–21, 129, 145–70.) The illegal gambling is inextricably intertwined with Defendants' Terms and Conditions, which expressly incorporate Defendants' "Casino Sweepstakes Rules" and regulate the use and redemption of "Sweeps Coins" and "Prizes"—i.e., gambling winnings. (Dkt. 43-13, at 2–3; T&C §§ 3.2, 3.6, 3.8, 3.12,

5.2, 5.11, 5.13, 5.15, 5.16, 6.1, 6.2, 7.1, 8.1.) Furthermore, acceptance of Defendants' Terms and Conditions—and the arbitration clause specifically—is a condition for participating in Defendants' online casinos. As the Terms and Conditions state:

> By using, or otherwise accessing the Service, . . . you accept and agree to this Arbitration Agreement. If you do not agree to this Arbitration Agreement, then you may not access or use the Service or Website.

(*Id.* § 12.1.) The arbitration clause is thus part of an illegal gambling contract and is unenforceable. *Smith*, 2005 CarswellOnt 2640, ¶¶ 28–30; *see also Transp. N. Am. Express Inc.*, 2004 SCC 7, ¶ 6 ("[C]ontracts so objectionable that their illegality will taint the entire contract . . . [such as] contracts that have a criminal object should be declared void *ab initio*.").[12]

Defendants argue that "Plaintiffs cannot avoid their obligation to arbitrate by contending that the Terms & Conditions embody an illegal contract." (Dkt. 43, at 8.) In support, Defendants cite *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006). But *Buckeye* (and the other applicable cases cited by Defendants) was decided "as a matter of substantive federal arbitration law" under the Federal Arbitration Act.[13] *Id.* Here, however, as discussed above, Defendants' motion is governed by the Ontario Arbitration Act.

## CONCLUSION

Because the arbitration clause in Defendants' Terms and Conditions is invalid and unenforceable, Defendants' motion should be denied.

---

[12]    To be clear, Plaintiffs need not yet *prove* that Defendants' online casinos constitute illegal gambling at this stage. As *Smith* illustrates, allegations of illegality in the container contract are sufficient to refuse a pleading-stage request to stay litigation under the Ontario Arbitration Act.

[13]    Two of the cases cited by Defendants did not even address the question of whether illegality of the container contract renders an arbitration clause unenforceable. *Nessim v. Fliff, Inc.*, 23-cv-01048, 2024 WL 1600649 (C.D. Cal. Jan. 5, 2024); *Fair Gaming Advocates MA LLC v. VGW Holdings Ltd.*, No. 2384-CV-02451, 2024 WL 5279408 (Mass. Super. Ct. Dec. 12, 2024).

Respectfully Submitted,

**VINCENT AMBROSIA JR. and ROBERT HOUPT,** individually and on behalf of all others similarly situated,

Dated: July 21, 2025

By: */s/ Roger Perlstadt*
One of Plaintiffs' Attorneys

J. Eli Wade-Scott
ewadescott@edelson.com
Michael Ovca
movca@edelson.com
Hannah Hilligoss
hhilligoss@edelson.com
Ari J. Scharg
ascharg@edelson.com
Roger Perlstadt
rperlstadt@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel.: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs and the putative class*